# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is dated as of February 10, 2010, by and among Mucho Pizza, LLC ("Buyer"), and Pizza Partners of Maryland, L.P.; Pizza Foods of Texas, L.P., TEG Pizza Partners of Texas, L.P., TEG-Pizza Partners Holdings, L.P. and Winmar Pizza, L.P (collectively, "Seller").

## Recitals

WHEREAS, Seller is engaged in the business of operating pizza restaurants pursuant to franchise agreements (the "Franchise Agreement") with CiCi Enterprises, L.P. (the "Business");

WHEREAS, Winmar Pizza, L.P. filed for protection under Chapter 11 of the United States Bankruptcy Code (as hereinafter defined) on May 15, 2009 and the remaining Sellers filed for protection under Chapter 11 of the United States Bankruptcy Code on June 28, 2009, and are debtors-in-possession in Case Nos. 09-33027-BJH-11, pending under Chapter 11 of the Bankruptcy Code and jointly administered in the United States Bankruptcy Court in the Northern District of Texas (the "Bankruptcy Case");

WHEREAS, Buyer wishes to purchase from Seller, and Seller is willing to sell and convey to Buyer, those assets of Seller as described herein, free and clear of liens, claims, encumbrances, and interests, pursuant to section 363 of the Bankruptcy Code and assignment of Franchise Agreements and leases of real property at locations on which the Seller operates restaurants pursuan to the Franchise Agreements and subject to the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual premises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I -- DEFINITIONS

**1.01. Definitions.** The following terms, as used herein, have the following meanings:

"9019 Agreement" means that agreement between CiCi, The Frost National Bank ("Frost"), Seller, affiliates of the Seller, and certain other persons presented to the Court for approval by that Joint Motion for Approval of Compromise and Settlement with The Frost National Bank, CiCi Enterprises, LP and Certain Guarantors of Obligations of Certain Debtor Obligations filed on or about December 16, 2009 in the Chapter 11 Cases.

"Adequate Assurance Proof" shall mean information in the form of documents that can be offered as evidence at the sale hearing to provide proof that the Buyer can provide adquate assurance of future performance" as required by 11 U.S.C. §365(f)(2)(B) for each and every Assumed Contract; adequate assurance proof shall expressly exclude the requireent that any insider or affiliate of the Buyer execute any personal guaranty of any obligation of Seller or Buyer to Franchisor or any affiliate or insider of Franchisor under any or all of the Franchise Agreements.

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with such other Person.

"Ancillary Agreements" means, collectively, the Bill of Sale and the Assignment and Assumption Agreement.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 2.07(b).

"Assumed Contracts" shall have the meaning set forth in Section 2.02(b).

"Bankruptcy Case" shall have the meaning set forth in the recitals.

"Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, as in effect on May 15, 2009, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Texas or, if such court ceases to exercise jurisdiction over the Chapter 11 Cases, the court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases.

"Bankruptcy Court Orders" shall mean the Bid Procedures Order, the Sales Order, and all other orders of the Bankruptcy Court necessary for Seller to execute and perform this Agreement.

"Bill of Sale" shall have the meaning set forth in Section 2.07(a).

"Business" has the meaning assigned to that term in the preamble of this Agreement.

"Business Day" means a day other than Saturday, Sunday or any day on which banks located in the State of Texas are authorized or obligated to close.

"Buyer" shall have the meaning set forth in the preamble of this Agreement.

"Chapter 11 Cases" shall mean the cases under Chapter 11 of the Bankruptcy Code commenced by Seller.

"Closing" shall have the meaning set forth in Section 2.07.

"Closing Date" shall have the meaning set forth in Section 2.07.

"Contracts" shall have the meaning set forth in Section 2.02(b).

"Earnest Money Deposit" shall have the meaning set forth in Section 2.01.

"Franchise Agreements" shall mean all agreements between Seller and Franchisor for the operation of a restaurant or restaurants; the singular "Franchise Agreemet" shall mean a single Franchise Agreement between Franchisor and Seller.

"Franchisor" shall mean CiCi Enterprises, LP ("CiCi") and shall include where appropriate affiliates and insiders of CiCi.

"GAAP" shall mean U.S. generally accepted accounting principles as in effect from time to time.

"Governmental Authority" shall mean any governmental, regulatory, judicial, or administrative body, agency, commission, board, court, or authority, whether international, national, federal, state or local.

"Knowledge" with respect to a Party, means the actual knowledge of the officers, general partners, managers and/or members of such Party.

"Leases" shall mean each and every agreement of Seller with any person for the right to lease, occupy and/or use real property and improvements at all locations at which Seller operates restaurants pursuant to the Franchise Agreements; the singular "Lease" shall mean an individual lease at which Seller operates a restaurant pursuant to a Franchise Agreement.

"Lessors" shall mean the persons other than the Seller who are parties to the Leases: the singular "Lessor" shall mean a person other than the Seller who is a party to a Lease.

"Legal Requirement" means any requirement of any federal, state, local, municipal, foreign, international, multinational, or other constitutional, law, ordinance, principal of common law, regulation, statute or treaty.

"Liabilities" means every "debt" as defined in the Bankrptcy Code, and includes debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, known or unknown, including those arising under any Legal Requirement (under law or equity and under any theory of liability), any action or order of any Governmental Authority, or any contract or agreement.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"Parties" means Buyer and Seller.

"Person" means an individual, corporation, partnership, association, limited liability company, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Purchased Assets" shall have the meaning set forth in Section 2.02.

"Purchase Price" shall have the meaning set forth in Section 2.05.

"Records" shall have the meaning set forth in Section 2.02(c).

"Sale Hearing" shall mean a hearing conducted by the Bankruptcy Court on the motion of the Seller for authority to consummate the transactions contemplated by this Agreement.

"Sale Order" shall mean that order entered by the Bankruptcy Court at or after the Sale Hearing granting the Seller the authority to enter into the transactions contemplated by this Agreement.

"Seller" shall have the meaning set forth in the preamble of this Agreement.

"Successful Bid" means the "Successful Bid" as defined in the Bid Procedures Order and approved by the Bankruptcy Court.

"Tax" means any income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, franchise, capital, paid-up capital, profits, greenmail, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, custom, duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign) responsible for the imposition of any such tax.

"Triple Net Charges" shall mean any amounts owed by Seller to Lessors that are not characterized as rent under the Leases.

### ARTICLE II -- PURCHASE AND SALE

**2.01. Earnest Money Deposit.** Prior to the date of the execution and delivery of this Agreement by the Parties, Buyer has delivered cash to Seller (the "Earnest Money Deposit") to be held in escrow pursuant to the terms of this Agreement. If the Bankruptcy Court enters the Sale Order, the Earnest Money Deposit shall be delivered to Seller and credited against the Purchase Price. If the Buyer does not timely deliver the Adequate Assurance Proof and/or the Bankruptcy Court does not enter the Sale Order at the Sale Hearing, the Earnest Money Deposit shall be retained by the Seller as liquidated damages for the Buyer's failure to deliver the Adequate Assurance Proof. The Earnest Money Deposit shall be returned to Buyer if the Buyer timely delivers the Adequate Assurance Proof, but the Bankruptcy Court does not enter the Sale Order.

**2.02. Purchase and Sale.** Upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, assign and deliver, or cause to be sold, transferred, assigned and delivered, to Buyer, at Closing, free and clear of all Liens, all as contemplated by Section 363 of the Bankruptcy Code, all of Seller's right, title and interest in and to the assets identified below in this Section 2.02 (the "Purchased Assets"):

(a) the furniture, supplies, equipment, inventory, parts, goods in process, finished goods, leasehold improvements, and other tangible personal property of Seller located at the restaurants operated by the Seller under one or more of the Assumed Contracts;

(b) subject to Section 2.03 below, all rights under the contracts, agreements, licenses, commitments and other instruments of the Seller under the Franchise Agreements and the Leases (collectively, the "Assumed Contracts"); provided however, that at or prior to Closing Buyer may, without reducing the Purchase Price, deliver a list specifying the Franchise Agreements and Leases that will be assigned to Buyer with the exception of that lease in the name of Winmar Pizza, L.P. as the tenant of space located at 9400 N. Central Expressway, Suite 1304, Dallas, Texas, which must be assigned to Buyer.

(c) all lists, records, reports, correspondence and other files (including sale and commission information) concerning present and former employees , consultants, vendors and purchases of materials, supplies and services whether

in hard copy or computer format, and the books and records (excluding all tax records relating to Seller or the Business) of the Business (the "Records"); and

(d)   all goodwill and other intangible assets relating to the Purchased Assets and the Business.

**2.03.   Assumption of Liabilities.**  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of Closing, to assume the following Liabilities of Seller (the "Assumed Liabilities"):

(a)   all Liabilities first arising under the Assumed Contracts after the Closing Date;

(b)   All Liabilities under Assumed Contracts, whether such liability arose before or after the Closing Date, for Capital Expenditures required by Sections XIV(B)(1)(g) and VII(B) and (C) of the Assumed Contracts between CiCi and the Seller;; provided however, that the maximum amount of money that Buyer shall be required to expend for Capital Expenditures at each restaurant operated by the Seller under the Franchise Agreements shall be the amount stated on Exhibit E to the Supplemental Statement of Cure Costs filed on or about October 6, 2009, by CiCi in the Chapter 11 Cases. Seller and Buyer expressly intend that the Buyer is a third party beneficiary of the rights of the Seller related to Capital Expenditures under the 9019 Agreement.[1]

(b)   all Liabilities of Seller arising under Assumed Contracts for those claims identified in Section 2.12(b); provided however that the liablity assumed is liability only for claims that arose on or after March 1, 2010; and

(c)   all Liabilities of Seller for those claims identified in Section 2.12(c); provided however that the liablity assumed is liability only for claims that arose on or after March 1, 2010.

**2.04.   Excluded Liabilities.**  Notwithstanding any provision in this Agreement to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other Liabilities of Seller of whatever nature, whether presently in existence or arising or asserted hereafter (all such Liabilities not being assumed being herein referred to as the "Excluded Liabilities").

**2.05.   Purchase Price.**  Subject to the terms and conditions of this Agreement, in consideration of the sale and assignment of the Purchased Assets by Seller, Buyer agrees to pay to Seller at Closing an amount equal to eleven million and no/100 Dollars ($11,000,000.00) (such amount includes the Earnest Money Deposit to be paid to Seller) in cash by wire transfer to an account designated by Seller (the "Purchase Price").

**2.06.   Allocation of the Purchase Price.**  Buyer may propose an allocation of the Purchase Price among the Purchased Assets at Closing. If Buyer propses an allocation of the Purchase Price among the Purchased Assets, the allocation shall be attached to the Bill of Sale. If Buyer proposes an allocation of the Purchase Price among the Purchased Assets, Buyer and

---

[1]   If Buyer can perform the items required by the Capital Expenditures for amounts less than the amounts stated on Exhibit E to the Supplemental Statement of Cure Costs filed by CiCi, the Buyer shall not be required or in any way obligated to spend the amounts stated on Exhibit E.

Seller agree that they will prepare and file their federal and any state or local income tax returns based on such allocation of the Purchase Price. Buyer and Seller agree that they will prepare and file any notices or other filings required pursuant to Sections 338 and 1060 of the Internal Revenue Code of 1986, as amended, and that any such notices or filings will be prepared based on such allocation of the Purchase Price. The failure of the Buyer to propose an allocation of the Purchase Price among the Purchased Assets shall not relieve the Buyer of any obligation under this Agreement.

**2.07. Closing.** The closing of the transfer and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at 9400 N. Central Expressway, Suite 1304, Dallas, TX 75231, on or before March 31, 2010 unless the Sale Order is entered after March 31, 2010 in which event the Closing shall take place on the third (3rd) business day after the date on which the Bankruptcy Court enters the Sale Order. Throughout this Agreement, such event is referred to as the "Closing" and such date and time are referred to as the "Closing Date." At the Closing, the Parties agree to take the following steps listed below (provided, however, that upon their completion all such steps shall be deemed to have occurred simultaneously):

(a) Seller shall execute and deliver a Bill of Sale substantially in the form of Exhibit A attached hereto (the "Bill of Sale").

(b) Buyer and Seller shall each execute and deliver an Assignment and Assumption Agreement substantially in the form of Exhibit B attached hereto (the "Assignment and Assumption Agreement").

(c) Buyer shall deliver to Seller the Purchase Price, as adjusted.

(d) Buyer shall deliver Transaction Taxes to the appropriate Governmental Authority, if applicable.

**2.08. Additional Acts.** At or subsequent to the Closing, the Parties shall execute and deliver any other agreements or instruments and take any actions as may be reasonably required for the implementation of this Agreement and the transactions contemplated hereby.

**2.09. Closing Costs.** The Parties recognize and acknowledge that, inasmuch as the transactions contemplated hereby are contemplated by the Sale Order, such transactions are and shall be, to the greatest extent permissible under Applicable Law, subject to the provisions of section 1146(a) of the Bankruptcy Code, and the sale, transfer, assignment and delivery of the Purchased Assets may be exempt under section 1146(a) of the Bankruptcy Code and the Sale Order from state and local transfer, recording, stamp or other similar transfer taxes (collectively, "Transaction Taxes") that may be imposed by reason of the transactions contemplated by this Agreement; provided, however, that if Transaction Taxes are assessed for any reason, Buyer shall pay the Transaction Taxes and any recording and filing fees. Seller and Buyer shall, if necessary, cooperate to seek any determination of the exemption from Transaction Taxes through submitting any dispute thereof to the Governmental Authority charged with responsibility for collection or determination of the disputed tax pursuant to Bankruptcy Code section 1146(b). At the Closing, Buyer and Seller shall remit to each other properly completed resale exemption certificates and other similar certificates or instruments as are applicable to claim available exemptions from the payment of sales, transfer, use or other similar taxes under Applicable Law. Buyer shall pay all Taxes applicable to, imposed upon or arising out of the sale or transfer of the Purchased Assets to

Buyer and the other transactions contemplated by this Agreement (including, but not limited to, sales, use, gross receipts, and intangible taxes), all costs and expenses incurred by Buyer as a result of any financing obtained by Buyer, and all costs incurred by Buyer to obtain any necessary governmental and other consents to the transfer of the Purchased Assets to Buyer. Each Party hereby waives and relinquishes any and all claims of reimbursement against the other Party for any excess estimated payment when the ad valorem tax statements for the year in which the Closing occurs become available. Except as set forth in this Section or elsewhere in this Agreement, each of the Parties shall bear its own expenses and the expenses of its counsel and other agents in connection with the transactions contemplated hereby.

**2.10. Passage of Title at Closing.** Upon delivery of the Ancillary Agreements, and in accordance with and subject to the conditions set forth in this Agreement, title to the Purchased Assets shall pass to Buyer at the Closing. At the Closing, Seller will place Buyer in possession of all of the Purchased Assets and from and after the Closing the ownership and operation of the Purchased Assets shall be for the account and risk of Buyer.

**2.11. Access and Right of Inspection.** Between the date hereof and the Closing Date, Seller shall give to Buyer and its officers, agents, employees, counsel, accountants and other representatives, reasonable access to the management and professionals of Seller and the Purchased Assets, and Seller shall furnish to Buyer such information related to the Purchased Assets as Buyer shall from time to time reasonably request for the purposes of allowing Buyer to prepare for the transition of the Purchased Assets from Seller to Buyer, including, without limitation, allowing Buyer access to (a) Seller's legal and other professionals (without thereby waiving or affecting any privilege applicable to communications between Seller and its lawyers, accountants or other professionals), and (b) employees, vendors and customers of the Business, provided, however, that a representative of Seller shall participate in any such contacts or communications with the same; provided, further, that any such investigation shall be conducted (i) during normal business hours; (ii) in such a manner as not to materially interfere with the operation of Seller's business, and (iii) with respect to any physical inspection of any Purchased Assets, after giving reasonable advance notice to Seller. Buyer shall not be permitted to conduct site testing, or any sampling of any material or media, including soil, surface water, or ground water unless Seller, in Seller's reasonable discretion, has approved in writing such testing, and sampling, the specific scope of work therefor, the consultant performing such work and other reasonable requirements including insurance and restoration requirements. Buyer shall provide Seller with copies of all reports, studies, site assessments, tests, or other written materials prepared by third party consultants in connection with any such testing or sampling of the Seller real property.

**2.12 Adjustments to Purchase Price.** At Closing, the Purchase Price shall be adjusted as follows:

    (a)    The Purchase Price shall be increased by the following amounts:

        (i)    The amount of all security or other deposits of Seller in possession with any Lessor or person acting on behalf of a Lessor ;

        (ii)    The amount of all security or other deposits of Seller in possession of any Person who provides utility services to Seller.

Upon payment of any amounts relating to Section 2.12(a)(i) and (ii), at Closing Seller shall assign to Buyer any and all rights of Seller in any items listed in Sections 2.12(a)(i) and (ii).

(b) At Closing, the Purchase Price shall be reduced by an amount equal to the Triple Net Charges for 2008, multiplied by quotient of the number of calendar days from January 1, 2010 through the Closing Date divided by 365. Buyer shall be liable to the nondebtor parties to Assumed Contracts for all Triple Net Charges for the year 2010. If 2010 charges exceed the 2008 Triple Net Charges, Buyer shall receive no additional adjustment of the Purchase Price.

(c) At Closing, the Purchase Price shall be reduced by an amount equal to the 2010 personal property taxes, (the "Personal Property Taxes") multiplied by result of the number of calendar days from January 1, 2010 through the Closing Date divided by 365. If 2010 Personal Property Taxes have not been assessed on the Closing Date, the Purchase Price shall be reduced by the an amount equal to the personal property taxes assessed against the Purchased Assets in 2008 multiplied by quotient of the number of calendar days from January 1, 2010 through the Closing Date divided by 365. Buyer shall be liable for all Personal Property Taxes for the year 2010.

(d) If the sale occurs on a day after the first day of the month, the Purchase Price shall be increased by an amount equal to the total monthly rent for all Leases that are Assumed Contracts multiplied by the number of days from the first day of the month through the Closing Date divided by the number of days in the month of the Closing Date.

### ARTICLE III -- REPRESENTATIONS AND WARRANTIES OF SELLER

Except as disclosed by Seller to Buyer in writing or in the Disclosure Schedules attached hereto, Seller hereby represents and warrants to Buyer as of the date of this Agreement that:

**3.01. Company Existence and Power.** Seller is a limited partnership, duly formed, validly existing and in good standing under the laws of the State of Texas.

**3.02 Disclaimer.** BUYER AGREES THAT IT WILL PERFORM ALL EXAMINATIONS AND INVESTIGATIONS OF THE BUSINESS, THE PURCHASED ASSETS AND THE CONTRACTS, IT DEEMS NECESSARY, PRIOR TO THE CLOSING, AND THAT BUYER WILL RELY SOLELY UPON SUCH EXAMINATIONS AND INVESTIGATIONS IN PURCHASING THE PURCHASED ASSETS. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT BUYER IS PURCHASING THE PURCHASED ASSETS "AS IS" AND "WHERE IS," AND WITH ALL FAULTS AND THAT SELLER IS MAKING NO REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE. BUYER AGREES THAT SELLER IS NOT LIABLE OR BOUND BY ANY GUARANTEES, PROMISES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PURCHASED ASSETS MADE OR FURNISHED BY ANY BROKER, EMPLOYEE, SERVANT OR OTHER PERSON REPRESENTING OR PURPORTING TO REPRESENT SELLER. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE COMPENSATION TO BE PAID TO SELLER FOR THE PURCHASED ASSETS HAS BEEN DECREASED TO TAKE INTO ACCOUNT THAT THE PURCHASED ASSETS ARE BEING SOLD SUBJECT TO THE FOREGOING DISCLAIMERS. BUYER AND SELLER AGREE

THAT THE PROVISIONS OF THIS SECTION 3.02 SURVIVE THE CLOSING OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT.

## ARTICLE IV -- REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that:

**4.01. Corporate Existence.** Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas. Buyer is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

**4.02. Authorization and Enforceability.** The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation by Buyer of the transactions contemplated hereby and thereby are within Buyer's legal power and authority and have been, or will be on or before the Closing Date, duly authorized by all necessary corporate action on the part of Buyer.

**4.03. Non-Contravention.** The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) contravene or conflict with the articles of incorporation and bylaws of Buyer or (ii) contravene or conflict with or constitute a violation of any provision of any law, regulation, judgment, injunction, order or decree binding upon or applicable to Buyer. The execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby require no action by or in respect of, or filing with, any Governmental Authority other than compliance with any applicable requirements of securities laws or any necessary filings with the Bankruptcy Court.

**4.04. Consents.** No consent, approval, waiver or other action by any Person under any material contract, agreement, indenture, lease, instrument or other document to which Buyer is a party or by which it is bound is required or necessary for the execution, delivery and performance by Buyer of this Agreement or the Ancillary Agreements to which it is a party or the consummation of the transactions contemplated hereby or thereby.

**4.05. Litigation.** There are (i) no actions, suits, proceedings, or investigations pending or, to the Buyer's Knowledge, threatened against Buyer or its properties before any Governmental Authority (and, to Buyer's Knowledge, there is no reasonable basis therefor), (ii) to the Buyer's Knowledge, no actions, suits, proceedings or investigations are pending or threatened against its employees that may relate to their employment with, or conduct on behalf of, Buyer, and (iii) no actions, suits, proceedings, or investigations pending or, to the Buyer's Knowledge, threatened that question the validity of this Agreement or the Ancillary Agreements or the transactions contemplated hereby.

**4.06. No Reliance**

    (a) Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the financial condition, liabilities, results of operations and projected operations of Seller and the nature and condition of its properties, assets and businesses and, in making the determination to proceed with the

        transactions contemplated by this Agreement, has relied solely on the results of its own independent investigation and the representations and warranties set forth herein.

    (b)    In connection with Buyer's investigation of Seller, Buyer may receive from Seller and its Affiliates, agents and representatives certain projections and other forecasts, including but not limited to projected financial statements, cash flow items and other data of Seller. Buyer acknowledges that there are uncertainties inherent in attempting to make such projections and other forecasts and plans and accordingly is not relying on them, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections and other forecasts and plans so furnished to it, and that Buyer and its Affiliates, agents and representatives shall have no claim against any Person with respect thereto. Accordingly, Buyer acknowledges that neither Seller nor Seller's representatives, agents or Affiliates, have made any representation or warranty with respect to such projections and other forecasts and plans.

    (c)    In connection with Buyer's investigation of the Purchased Assets, Buyer has not received any information from Seller, its Affiliates, agents, representatives, or employees that is not available to other parties receiving information on the Purchase Assets pursuant to the Bid Procedures Order.

**4.07. No Other Representations or Warranties.** Except for the representations and warranties expressly provided in this Agreement, neither the Company nor any other Person on behalf of Seller or any of its Affiliates makes any express or implied representation or warranty with respect to Seller or any of its Affiliates or with respect to any other information provided to Buyer, its Affiliates, agents or representatives in connection with the transactions contemplated hereby. Neither Seller nor any other Person will have or be subject to any liability or other obligation to Buyer, its Affiliates, agents or representatives or any Person resulting from Buyer's use of, or the use by any of Buyer's Affiliates, agents or representatives of, any such information, including any information, documents, projections, forecasts of other material made available to Buyer, its Affiliates or representatives in certain "data rooms," offering memorandum or management presentations in expectation of the transactions contemplated by this Agreement. Except for the representations and warranties expressly provided in this Agreement, Seller disclaims any and all other representations and warranties, whether express or implied.

## ARTICLE V -- COVENANTS OF SELLER

**5.01. Notices of Certain Events.** From the date hereof until the Closing Date, Seller shall promptly notify Buyer of any actions, suits, claims, investigations or proceedings commenced or, to the Knowledge of Seller, threatened, against Seller that affect the Purchased Assets or Seller's ability to consummate the transactions contemplated by this Agreement.

## ARTICLE VI -- OTHER AGREEMENTS

**6.01. Commercially Reasonable Efforts Further Assurances.** Subject to the terms and conditions of this Agreement, each of the Parties to this Agreement will use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the

transactions contemplated by this Agreement. Seller and Buyer each agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement and to vest in Buyer good and valid title to the Purchased Assets.

**6.02. Certain Filings.** Seller and Buyer shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement, (b) in furnishing information required in connection with taking any such actions or making any such filings and (c) in seeking, in a timely manner, to take any such actions or obtain any such consents, approvals or waivers.

**6.03. Maintenance of Seller Records; Sharing of Information.** Buyer shall, for a period of five (5) years following the Closing Date, maintain all of the Records provided by Seller to Buyer hereunder. Seller shall have the right at any time during such period to have reasonable access to such for the limited purposes of administering the Chapter 11 Cases, concluding its involvement in the Business, preparing for the prosecution or defense of any claim, suit or proceeding, and complying with its obligations under applicable laws and regulations. During such five (5) year period, Seller shall be permitted to make copies of any such Records, at is sole costs and expense. The records shall be maintained at 9400 N. Central Expressway, Suite 1304, Dallas, Texas, until the expiration of the lease of such location.

**6.04. Employees.** Seller acknowledges that Buyer is under no obligation to offer employment to any employees of Seller subsequent to Closing. To the extent any such employees are employed by Buyer following the Closing, such employment shall be on terms and conditions determined by Buyer, and Buyer shall have no obligation to offer such employees the same or similar wages, salaries or benefits as are paid or provided by Seller prior to the Closing.

## ARTICLE VII -- CONDITIONS TO CLOSING; ADEQUATE ASSURANCE PROOF

**7.01. Bankruptcy Court Approval.** The Parties agree that the Closing shall not occur unless and until the Sale Order is entered by the Bankruptcy Court approving this Agreement and authorizing and directing Seller to comply with the terms of this Agreement, including executing and delivering all necessary documents and instruments contemplated hereunder, pursuant to section 363 of the Bankruptcy Code. The Sale Order shall not be subject to any stay or injunction. The Sale Order shall provide, among other things, that:

(a) All of the Purchased Assets sold to Buyer hereunder shall be transferred to Buyer free and clear of all liens, encumbrances and liabilities of any kind whatsoever, except as expressly provided in this Agreement; and

(b) Buyer is not acquiring or assuming Seller's liabilities except as expressly provided in this Agreement, and is not subject to any successor liability for the liabilities and obligations of Seller.

(c) All Assumed Contracts shall have been assigned to, and assumed by, the Buyer by order of the Bankruptcy Court.

(d) The Sale Order shall provide that the Sale has been conducted in good faith and the Buyer is subject to the provisions of 11 U.S.C. §363(m).

**7.02. Conditions to Obligation of Buyer.** The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following conditions, each of which is for the benefit of Buyer and any one or more of which may be waived by Buyer:

(a) Seller shall have executed and delivered to Buyer the Bill of Sale.

(b) Seller shall have executed and delivered to Buyer the Assignment and Assumption Agreement.

(c) All sales taxes that are subject to valid lein claims shall be paid at Closing.

(d) The Sale Order shall have been entered and shall provide that the sale has been conducted in good faith and the Buyer is subject to the provisions of 11 U.S.C. §363(m).

**7.03. Conditions to Obligations of Seller.** The obligation of Seller to consummate the Closing is subject to the satisfaction of the following conditions, each of which is for the benefit of Seller and any one or more of which may be waived by Seller:

(a) The entry of the Sale Order by the Bankruptcy Court.

(b) The representations and warranties of Buyer contained in this Agreement shall have been true and correct in all material respects at and as of the date hereof, and they shall be true and correct in all material respects at and as of the Closing Date with the same force and effect as though made at and as of that time (other than for representations and warranties that address matters only as of a certain date, which shall be true and correct in all material respects as of such certain date). Buyer shall have performed and complied with in all material respects all of its obligations required by this Agreement to be performed or complied with at or prior to the Closing Date.

(c) There shall not be pending or threatened any actions, suits, claims, governmental investigations or arbitration proceedings that challenge the validity of this Agreement or any action taken or to be taken in connection herewith or otherwise seeks to restrain, prohibit or invalidate the transfer of the Purchased Assets by Seller or any other transaction contemplated hereby.

(d) Buyer shall have executed and delivered to Seller the Assignment and Assumption Agreement.

(e) Buyer shall have delivered the Purchase Price in cash or other immediately available funds to Buyer.

**7.04. Adquate Assurance Proof.** On or before 5:00 o'clock pm CST on March 2, 2010, Buyer shall deliver the Adequate Assurance Proof to Seller, Franchisor, and Lessors. It shall be the sole responsibility of the Buyer to provide such information to Seller, Franchisor and Lessors. It shall further be the sole obligation and responsibility of Buyer to comply with the local rules of the Bankruptcy Court regarding the preparation and delivery of witness and exhibit lists for the Sale Hearing with respect to issues of adequate assurance of future

performance of the Buyer under the Assumed Contracts   It shall further be the sole obligation and responsibility of the Buyer and Buyer's counsel to appear at the Sale Hearing and offer the Adquate Assurance Proof as evidence with respect to matters related to 11 U.S.C. §365(f)(2)(B).  If the Seller is unable to proceed with the Sale Hearing based on the failure of the Buyer to meet the Buyer's obligations under this section 7.04, and the Bankruptcy Court does not enter the Sale Order at the Sale Hearing, (a) the Buyer shall be in default of its obligations under this Agreement; (b) Seller shall be relieved of any and all obligations under this Agreement; and (c) the Seller shall be entitled to retain the Earnest Money Deposit as liquidated damages for the Buyer's breach of its obligations. Buyer and Seller agree that the actual damages that might be sustained by Seller by reason of the breach by Buyer of the Buyer's obligations under Section 7.04 of this Agreement are uncertain and would be difficult of ascertainment, and that amount of the Earnest Money Deposit would be reasonable compensation for such breach. Buyer hereby promises to pay, and Seller hereby agrees to accept, the Earnest Money Deposit as liquidated damages, and not as a penalty, in the event of such breach.

## ARTICLE VIII -- SURVIVAL

**8.01. Survival.** Regardless of any investigation at any time (whether before or after the execution of this Agreement) made by or on behalf of any Party hereto or of any information any Party may have in respect thereof, any representations and warranties of Seller contained in this Agreement shall not survive the Closing. The covenants contained in this Agreement that are performable in their entirety prior to or at Closing shall not survive the Closing, and the covenants that are able to be performed after Closing shall survive the Closing indefinitely until such are fully performed.

## ARTICLE IX -- TERMINATION

**9.01. Grounds forTermination.** This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of Seller and Buyer;

(b) by either Seller or Buyer if consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction;

(c) by Seller if there has been (1) any material misrepresentation or breach by Buyer of any warranty, representation or agreement contained herein or (2) any failure on the part of Buyer to satisfy timely in any material respect any condition contained herein, if such breach or failure is not cured within ten Business Days of receipt of written notice thereof from Seller;

(d) by either Buyer or Seller, if Closing has not occurred on or before May 31, 2010 (the "Termination Date"); provided, however, that the right to terminate this Agreement under this Section 9.01(d) shall not be available (i) to Seller, if any breach of this Agreement by Seller has been the principal cause of, or resulted in, the failure of the Closing to occur on or before the Termination Date or (ii) to Buyer, if any breach of this Agreement by Buyer has been the principal cause of, or resulted in, the failure of the Closing to occur on or before the Termination Date.

(e) By Seller if Buyer does not comply with Section 7.04 of this Agreement.

**9.02. Effect of Termination.**

(a) In the event of termination of this Agreement pursuant to Sections 9.01(a) or (b), Seller shall return the Earnest Money Deposit to Buyer.

(b) If Seller terminates this Agreement pursuant to Section 9.01(c) or (e), Seller may retain the Earnest Money Deposit as liquidated damages as stated in Section 7.04 of this Agreement and in other provisions of this Agreement..

(c) If Buyer terminates this Agreement pursuant to Section 9.01(d) Seller shall refund the Earnest Money Deposit to Buyer.

(d) Other than the rights, remedies and payments set forth in Sections 9.02 upon a termination of this Agreement no Party to this Agreement shall have any further liability or obligation hereunder to the other Party hereto, except that Articles IX and X shall survive any such termination.

## ARTICLE X -- MISCELLANEOUS

**10.01. Amendment and Modification.** The Parties hereto may only amend, modify and supplement this Agreement in writing.

**10.02. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

**10.03. Entire Agreement.** This Agreement, the Ancillary Agreements, any confidentiality agreements between the Parties in effect on or prior to the date hereof, and the appendices, exhibits and schedules attached hereto and thereto, contain the entire agreement of the Parties hereto with respect to the transfer of the Purchased Assets and the other transactions contemplated herein, and supersede and completely replace all prior understandings and agreements, whether written or oral, of the Parties with respect to the subject matter hereof. Any reference herein to this Agreement shall be deemed to include the schedules and exhibits attached hereto.

**10.04. Usage**

(a) In this Agreement, unless a clear contrary intention appears (i) the singular number includes the plural number and vice versa; (ii) reference to any person includes such person's successors and assigns; (iii) reference to any gender includes each other gender; (iv) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (v) reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision;

(vi) "hereunder", "hereof", "hereto" and words of similar import shall be deemed references to this agreement as a whole and not to any particular Article, Section or other provision thereof; (vii) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; (viii) "or" is used in the inclusive sense of "and/or"; (ix) with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and (x) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

(b) Unless otherwise specified herein, all accounting terms used therein shall be interpreted and all accountings determinations thereunder shall be made in accordance with GAAP.

(c) This Agreement was negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof.

**10.05. Headings.** The descriptive headings in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

**10.06. Execution in Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together will constitute one and the same instrument.

**10.07. Notices.** Any notice, request, information or other document to be given hereunder to any of the Parties by any other Party shall be in writing and delivered personally or sent by certified or registered mail, postage prepaid, as follows:

If to Seller, addressed to:

Winmar Pizza, LP, *et al.*
ATTN: Norman Winton
9400 N. Central Expressway, Suite 1304
Dallas, TX 75231

With a copy to:

Richard W. Ward
6860 N. Dallas Parkway, Suite 200
Plano, TX 75024


If to Buyer, addressed to:

Mucho Pizza, LLC
ATTN: Manager
3318 Forest Lane, Suite 200
Dallas, TX 75234

        With a copy to :
        Sun Holdings, LLC
        ATTN: President
        3318 Forest Lane, Suite 200
        Dallas, TX 75234

**10.08 Governing Law/Consent to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and to be performed herein. The Parties agree that any claim or dispute relating to or arising out of this Agreement or the transactions contemplated hereby shall be addressed solely by a state or federal court of competent jurisdiction in the State of Texas, and the Parties hereby agree to subject themselves to the jurisdiction of such court for all such purposes and agree to waive any objections thereto.

**10.09 Relationship of Parties.** Nothing in this Agreement shall constitute or be deemed to constitute a partnership between the Parties or constitute or be deemed to constitute any party hereto as agent of another party hereto, or its Affiliates, for any purpose whatever, and no Party hereto shall have authority or power to bind any other Party, or its Affiliates, or to contract in the name of or create a liability against any party hereto or its Affiliates, in any way or for any purpose.

**10.10 Assignment.** No Party to this Agreement shall be entitled to transfer or assign its rights or obligations hereunder without the prior written consent of the other Party. Any attempted assignment in violation of the foregoing shall be null and void.

**10.11 Waiver.** A waiver by either of the Parties of any breach by the other Party of any of the terms, provisions or conditions of this Agreement or the acquiescence of either Party hereto in any act (whether commission or omission) which but for such acquiescence would be a breach as aforesaid, shall not constitute a general waiver of such term, provision or condition of any subsequent act contrary thereto.

**10.12 Severability.** If any provision hereof is declared invalid by a court of competent jurisdiction or to be in violation of applicable laws such provision shall be ineffective only to the extent of such invalidity or such violation, so that the remainder of that provision and all remaining provisions of this Agreement will continue in full force and effect.

**10.13 Expenses.** Except as otherwise expressly provided in this Agreement, each Party shall bear its respective fees and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby.

**10.14 No Third-Party Beneficiaries.** This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns, except for the conveyance of third party benefits on the Buyer under the 9019 Agreement.

IN WITNESS WHEREOF the Parties hereto here caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER:**

Mucho Pizza, LLC

By: _____
Name: Guillermo Perales
Title: President

**SELLER:**

Pizza Partners of Maryland, L.P.
    By: TEG Pizza GP, LLC, its general partner

By: _____
Name: Norman Winton, Manager


Pizza Foods of Texas, L.P.
    By: TEG Pizza GP, LLC, its general partner

By: _____
Name: Norman Winton, Manager


TEG Pizza Partners of Texas, L.P.
    By: TEG Pizza GP, LLC, its general partner

By: _____
Name: Norman Winton, Manager

TEG-Pizza Partners Holdings, L.P.
    By: TEG Pizza GP, LLC, its general partner

By: _____
Name: Norman Winton, Manager

Winmar Pizza, L.P.
    By: TEG Pizza GP, LLC, its general partner

By: _____
Name: Norman Winton, Manager

# EXHIBIT A

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, (collectively "Assignor"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Assignee, does hereby sell, assign, transfer, convey, set over and deliver unto _____ ("Assignee"), all of Assignor's right, title and interest in and to the assets set forth on Exhibit A attached hereto (the "Assets").

Assignor does hereby bind itself and its successors and assigns to WARRANT AND FOREVER DEFEND, all and singular, title to said Assets unto Assignee, its successors and assigns, against every person lawfully claiming or to claim the same by, through, or under Assignor, but not otherwise.

THE INTEREST OF ASSIGNOR IN AND TO THE ASSETS IS CONVEYED BY ASSIGNOR AND ACCEPTED BY ASSIGNEE "AS IS" AND "WHERE IS" AND WITH ALL FAULTS, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESSED, IMPLIED, STATUTORY OF OTHERWISE, INCLUDING SPECIFICALLY, WITHOUT LIMITATION, WITHOUT IMPLIED WARRANTIES AS TO SUITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SAVE AND EXCEPT THE LIMITED WARRANTY OF TITLE CONTAINED HEREIN.

IN WITNESS WHEREOF, Assignor has caused this Bill of Sale to be executed as of _____, 2010.

# EXHIBIT B

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is entered into as of _____ 2010, by and between Pizza Partners of Maryland, L.P.; Pizza Foods of Texas, L.P., TEG Pizza Partners of Texas, L.P., TEG-Pizza Partners Holdings, L.P. and Winmar Pizza, L.P (collectively "Assignor"), and _____ ("Assignee").

WHEREAS, Assignee and Assignor are parties to that certain Asset Purchase Agreement dated February 10, 2010, (the "Purchase Agreement"), that provides, among other things, for the assumption by Assignee of the "Assumed Liabilities" (as defined in the Purchase Agreement); and

WHEREAS, in order to effectuate the assignment and assumption of the Assumed Liabilities, Assignor and Assignee are executing and delivering this Agreement.

NOW, THEREFORE, for and in consideration of the premises, the mutual covenants contained herein and in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby act and agree as follows:

1. **Assignment.** Assignor hereby assigns, conveys, transfers, and sets over unto Assignee, effective as of the date hereof, all of Assignor's rights, titles, and interests in, to and under the contracts described on Exhibit A attached hereto (the "Assumed Contracts"), and Assignee shall succeed to all of such rights, titles, and interests effective as of the date hereof.

2. **Assumption.** Assignee hereby accepts, assumes and agrees to pay, perform and discharge in accordance with terms thereof, all of the duties, liabilities and obligations of Assignor (i) arising under the Assumed Contracts and accruing or otherwise attributable to the time period from and after the date hereof or (ii) listed on Exhibit B attached hereto (the "Other Assumed Liabilities").

3. **Indemnification.** Assignee shall indemnify and hold harmless Assignor from and against (i) arising under the Assumed Contracts and accruing or otherwise attributable to the time period from and after the date hereof and (ii) the Other Assumed Liabilities.

4. **Defined Terms.** Terms not defined in this Agreement shall have the meanings set forth in the Purchase Agreement.

5. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto. The parties hereto shall execute and deliver such further and additional instruments, agreements, and other documents as may be necessary to evidence or carry out the provisions of this Agreement.

6. **Governing Law and Venue.** This Agreement is being executed and delivered, and is intended to be performed, in the State of Texas, and the laws of the State of Texas shall govern the validity, construction, enforcement and interpretation of this Agreement. This

APA 2-23-10

Agreement is performable in Dallas County, Texas, and the exclusive venue for any action brought with respect hereto, shall lie in the United States Bankruptcy Court in the Northern District of Texas.

7. **Counterparts.** This Agreement may be executed in any number of counterparts, and each counterpart shall be deemed to be an original instrument, but all such counterparts shall constitute one and the same instrument.

8. **Controlling Agreement.** It is contemplated that Assignor may, at any time or from time to time, execute, acknowledge and deliver one or more separate instruments of assignment and conveyance relating to the subject matter hereof no such separate instrument of assignment or conveyance shall limit the scope and effect of this Agreement. In the event that any conflict or ambiguity exists as between this Agreement and any such separate instrument of assignment or conveyance, the terms and provisions of this Agreement shall govern and be controlling.

9. **Descriptive Headings.** The descriptive headings of the several paragraphs, subparagraphs and clauses of this Agreement were inserted for convenience only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Agreement on the date first written above.

[Signature blocks to be inserted at Closing.]