# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is dated as of March 4, 2010, by and among Awesome Restaurant Group, Inc., an Ohio corporation, ("Buyer"), and Pizza Partners of Cincinnati, L.P. ("Seller").

## Recitals

WHEREAS, Seller is engaged in the business of operating pizza restaurants pursuant to franchise agreements with CiCi Enterprises, L.P. (the "Business");

WHEREAS, Winmar Pizza, L.P. filed for protection under Chapter 11 of the United States Bankruptcy Code (as hereinafter defined) on May 15, 2009 and the Seller filed for protection under Chapter 11 of the United States Bankruptcy Code on June 28, 2009, and are debtors-in-possession in Case Nos. 09-33027-BJH-11, pending under Chapter 11 of the Bankruptcy Code and jointly administered in the United States Bankruptcy Court in the Northern District of Texas (the "Bankruptcy Case"); and

WHEREAS, Buyer wishes to purchase from Seller, and Seller is willing to sell and convey to Buyer, those assets of Seller as described herein, free and clear of liens, claims, encumbrances, and interests, pursuant to section 363 of the Bankruptcy Code and subject to the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual premises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I -- DEFINITIONS

**1.01. Definitions.** The following terms, as used herein, have the following meanings:

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with such other Person.

"Ancillary Agreements" means, collectively, the Bill of Sale and the Assignment and Assumption Agreement.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 2.07(b).

"Assumed Contracts" shall have the meaning set forth in Section 2.02(b).

"Auction" shall have the meaning set forth in Section 2.11(a).

"Bankruptcy Case" shall have the meaning set forth in the recitals.

"Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, as in effect on May 15, 2009, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Texas or, if such court ceases to exercise jurisdiction over the Chapter 11 Cases, the court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases.

"Bankruptcy Court Orders" shall mean the Bid Procedures Order, the Sales Order, and all other orders of the Bankruptcy Court necessary for Seller to execute and perform this Agreement.

"Bid Procedures Order" shall have the meaning set forth in Section 2.11(a).

"Bill of Sale" shall have the meaning set forth in Section 2.07(a).

"Business" has the meaning assigned to that term in the preamble of this Agreement.

"Business Day" means a day other than Saturday, Sunday or any day on which banks located in the State of Texas are authorized or obligated to close.

"Buyer" shall have the meaning set forth in the preamble of this Agreement.

"Chapter 11 Cases" shall mean the cases under Chapter 11 of the Bankruptcy Code commenced by Seller.

"Closing" shall have the meaning set forth in Section 2.07.

"Closing Date" shall have the meaning set forth in Section 2.07.

"Contracts" shall have the meaning set forth in Section 2.02(b).

"Earnest Money Deposit" shall have the meaning set forth in Section 2.01.

"GAAP" shall mean U.S. generally accepted accounting principles as in effect from time to time.

"Governmental Authority" shall mean any governmental, regulatory, judicial, or administrative body, agency, commission, board, court, or authority, whether international, national, federal, state or local.

"Intellectual Property" means (i) any patent and patent applications, together with the goodwill associated therewith and all rights deriving therefrom or related thereto (the "Patents"); (ii) all trademarks, trademark applications, trademark registrations, trade names, brand names and service marks, together with any goodwill associated therewith and all rights deriving therefrom or related thereto; (iii) any registered copyrights or unregistered copyrights, together with any goodwill associated therewith and all rights deriving therefrom or related thereto; and (iv) all unpatented formulas, know-how, concepts, manufacturing methods and processes, inventions, discoveries, trade secrets, improvements and other technology in which the Seller has any rights (whether owned or not), together with the goodwill associated therewith and all rights deriving therefrom or related thereto.

"Knowledge" with respect to a Party, means the actual knowledge of the officers of such Party.

"Legal Requirement" means any requirement of any federal, state, local, municipal, foreign, international, multinational, or other constitutional, law, ordinance, principal of common law, regulation, statute or treaty.

"Liabilities" means every "debt" as defined in the Bankrptcy Code, and includes debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, known or unknown, including those arising under any Legal Requirement (under law or equity and under any theory of liability), any action or order of any Governmental Authority, or any contract or agreement.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"Material Adverse Effect" mean a material adverse change or effect, respectively, in the business, assets, condition (financial or otherwise), or results of operations of the Business, taken as a whole.

"Parties" means Buyer and Seller.

"Person" means an individual, corporation, partnership, association, limited liability company, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Purchased Assets" shall have the meaning set forth in Section 2.02.

"Purchase Price" shall have the meaning set forth in Section 2.05.

"Records" shall have the meaning set forth in Section 2.02(d).

"Sale Hearing" shall have the meaning set forth in Section 2.11(a).

"Sale Order" shall have the meaning set forth in Section 2.11(b).

"Seller" shall have the meaning set forth in the preamble of this Agreement.

"Successful Bid" means the "Successful Bid" as defined in the Bid Procedures Order and approved by the Bankruptcy Court.

"Tax" means any income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, franchise, capital, paid-up capital, profits, greenmail, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, custom, duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign) responsible for the imposition of any such tax.

## ARTICLE II -- PURCHASE AND SALE

2.01. **Earnest Money Deposit.** Prior to the date of the execution and delivery of this Agreement by the Parties, Buyer has delivered cash in an amount equal to five percent (5%) of the Purchase Price (the "Earnest Money Deposit") to be held in escrow pursuant to the terms of this Agreement. If the Closing occurs, the Earnest Money

Deposit shall be delivered to Seller and credited against the Purchase Price. The Earnest Money Deposit shall otherwise be returned to Buyer in accordance with the terms of the Bid Procedures Order.

**2.02. Purchase and Sale.** Upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, assign and deliver, or cause to be sold, transferred, assigned and delivered, to Buyer, at Closing, free and clear of all Liens, all as contemplated by Section 363 of the Bankruptcy Code, all of Seller's right, title and interest in and to the assets identified below in this Section 2.02 (the "Purchased Assets"):

(a) the furniture, supplies, equipment, inventory, parts, goods in process, finished goods and other tangible personal property of Seller and the assets of the restaurants identified below that are used in the Seller's Business but owned or otherwise held by another Debtor (as defined in the Bid Procedures Order):

(1) Store #565 located at 830 Eastgate South Drive, Cincinnati, Ohio 45245;

(2) Store # 633 located at 4989 Houston Road, Florence, KY 41042;

(3) the equipment from Store # 539 (which closed pre-bankrtupcy) that was located at 8529 Winton Road, Cincinnati, Ohio 45231; and

(4) the equipment from Store # 609 (which closed pre-bankrtupcy) that was located at 3550 Springdale Road, Cincinnati, Ohio 45246

(b) subject to Section 2.03 below, all rights under the contracts, leases, agreements, licenses, commitments and other instruments of the Seller (each, a "Contract" and collectively, the "Contracts") listed on Schedule 2.02(b) (collectively, the "Assumed Contracts");

(c) to the extent transferable, all of Seller's Intellectual Property owned by Seller and used in connection with the Business for the restaurants identified in Section 2.02(a), except any right to use the name "Pizza Partner of Cincinnati";

(d) all lists, records, reports, correspondence and other files (including sale and commission information) concerning present and former employees and consultants, whether in hard copy or computer format, and the books and records (excluding all tax records relating to Seller or the Business) of the Business (the "Records");

(e) all goodwill and other intangible assets relating to the Purchased Assets and the Business; and

(f) all rights to the corporate names, dbas and other identifiers, logos, URLs, IP addresses, domain names and registrations and other network, internet and email identifiers used for the restaurants identified in Section 2.02(a).

**2.03. Assumption of Liabilities.** Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of Closing, to assume the following Liabilities of Seller (the "Assumed Liabilities"):

(a)     all Liabilities of Seller arising under the Assumed Contracts

**2.04.   Excluded Liabilities.**   Notwithstanding any provision in this Agreement to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other Liabilities of Seller of whatever nature, whether presently in existence or arising or asserted hereafter (all such Liabilities not being assumed being herein referred to as the "Excluded Liabilities").

**2.05.   Purchase Price.**   Subject to the terms and conditions of this Agreement, in consideration of the sale and assignment of the Purchased Assets by Seller, Buyer agrees to pay to Seller at Closing an amount equal to two hundred thirty-six thousand and No/100 Dollars ($236,000.00) (such amount includes the $5,000 Earnest Money Deposit already paid to Seller and a credit of $55,000 Buyer had already deposited with Seller in refundable down deposit and an advancement for legal fees for an anticipated closing on a post-bankruptcy filing Asset Purchase Agreement between the parties that never closed and Seller had never refunded) in cash by wire transfer to an account designated by Seller (the "Purchase Price"). $50,000 of the purchase price shall be paid by means of a Promissory Note between Buyer and Seller.  Buyer shall have $126,000 in cash, certified check, or money order at closing.

**2.06.   Allocation of the Purchase Price**.  Among the Purchased Assets, the Purchase Price shall be allocated among each item or class of the Purchased Assets as set forth on <u>Exhibit A</u> attached hereto. Buyer and Seller agree that they will prepare and file their federal and any state or local income tax returns based on such allocation of the Purchase Price.  Buyer and Seller agree that they will prepare and file any notices or other filings required pursuant to Sections 338 and 1060 of the Internal Revenue Code of 1986, as amended, and that any such notices or filings will be prepared based on such allocation of the Purchase Price.

**2.07.   Closing.**   The closing of the transfer and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at 9400 N. Central Expressway, Suite 1304, Dallas, TX 75231, or on or before March 31, 2010 or if the Sale Order has not been entered before March 31, 2010, three (3) days after the date of entry of the Sale Order. However, that closing may be extended by the parties no more than thirty days, if any party delivers written notice to the other that it despite reasonable efforts, it may not be able to close on the scheduled date. Throughout this Agreement, such event is referred to as the "Closing" and such date and time are referred to as the "Closing Date."  At the Closing, the Parties agree to take the following steps listed below (provided, however, that upon their completion all such steps shall be deemed to have occurred simultaneously):

(a)     Seller shall execute and deliver a Bill of Sale substantially in the form of <u>Exhibit B</u> attached hereto (the "Bill of Sale").

(b)     Buyer and Seller shall each execute and deliver an Assignment and Assumption Agreement substantially in the form of <u>Exhibit C</u> attached hereto (the "Assignment and Assumption Agreement").

(c)     Buyer shall deliver to Seller the Purchase Price, as adjusted.

(d)     Buyer shall deliver Transaction Taxes to the appropriate Governmental Authority, if applicable.

(e)     Buyer and Seller shall each execute and deliver a Promissory Note and Security Agreement substantially in the form of Exhibits D & E attached hereto.

**2.08.   Additional Acts.**  At or subsequent to the Closing, the Parties shall execute and deliver any other agreements or instruments and take any actions as may be reasonably required for the implementation of this Agreement and the transactions contemplated hereby.

**2.09.   Closing Costs.**   The Parties recognize and acknowledge that, inasmuch as the transactions contemplated hereby are contemplated by the Sale Order, such transactions are and shall be, to the greatest extent permissible under Applicable Law, subject to the provisions of section 1146(a) of the Bankruptcy Code, and the sale, transfer, assignment and delivery of the Purchased Assets may be exempt under section 1146(a) of the Bankruptcy Code and the Sale Order from state and local transfer, recording, stamp or other similar transfer taxes (collectively, "Transaction Taxes") that may be imposed by reason of the transactions contemplated by this Agreement; provided, however, that if Transaction Taxes are assessed for any reason, Buyer shall pay the Transaction Taxes and any recording and filing fees. Seller and Buyer shall, if necessary, cooperate to seek any determination of the exemption from Transaction Taxes through submitting any dispute thereof to the Governmental Authority charged with responsibility for collection or determination of the disputed tax pursuant to Bankruptcy Code section 1146(b).  At the Closing, Buyer and Seller shall remit to each other properly completed resale exemption certificates and other similar certificates or instruments as are applicable to claim available exemptions from the payment of sales, transfer, use or other similar taxes under Applicable Law.  Buyer shall pay all Taxes applicable to, imposed upon or arising out of the sale or transfer of the Purchased Assets to Buyer and the other transactions contemplated by this Agreement (including, but not limited to, sales, use, gross receipts, and intangible taxes), all costs and expenses incurred by Buyer as a result of any financing obtained by Buyer, and all costs incurred by Buyer to obtain any necessary governmental and other consents to the transfer of the Purchased Assets to Buyer. Each Party hereby waives and relinquishes any and all claims of reimbursement against the other Party for any excess estimated payment when the ad valorem tax statements for the year in which the Closing occurs become available.   Except as set forth in this Section or elsewhere in this Agreement, each of the Parties shall bear its own expenses and the expenses of its counsel and other agents in connection with the transactions contemplated hereby.

**2.10.   Passage of Title at Closing.**  Upon delivery of the Ancillary Agreements, and in accordance with and subject to the conditions set forth in this Agreement, title to the Purchased Assets shall pass to Buyer at the Closing.  At the Closing, Seller will place Buyer in possession of all of the Purchased Assets and from and after the Closing the ownership and operation of the Purchased Assets shall be for the account and risk of Buyer.

**2.11.   Seller's Chapter 11 Bankruptcy Case.**

(a)     Seller Obtains Bankruptcy Approval of Transfer. Seller shall obtain the necessary court approval for the proposed sell of assets contemplated in this Agreement from the Bankruptcy Court in the pending Bankrupcty Case. Notwithstanding any provision of this Agreement to the contrary, this Asset Purchase Agreement is conditioned on Seller securing bankruptcy court approval of the parties' transaction and Buyer being approved by CiCi Enterprises as a franchise operator for the restaurants described in this

Agreement. Seller shall be liable for its costs, inclduing attorney and filing fees in obtaining court approval under this subparagraph.

(b) <u>Access and Right of Inspection</u>. Between the date hereof and the Closing Date, Seller shall give to Buyer and its officers, agents, employees, counsel, accountants and other representatives, reasonable access to the management and professionals of Seller and the Purchased Assets, and Seller shall furnish to Buyer such information related to the Purchased Assets as Buyer shall from time to time reasonably request for the purposes of allowing Buyer to prepare for the transition of the Purchased Assets from Seller to Buyer, including, without limitation, allowing Buyer access to (a) Seller's legal and other professionals (without thereby waiving or affecting any privilege applicable to communications between Seller and its lawyers, accountants or other professionals), and (b) employees, vendors and customers of the Business, provided, however, that a representative of Seller shall participate in any such contacts or communications with the same; provided, further, that any such investigation shall be conducted (i) during normal business hours; (ii) in such a manner as not to materially interfere with the operation of Seller's business, and (iii) with respect to any physical inspection of any Purchased Assets, after giving reasonable advance notice to Seller. Buyer shall not be permitted to conduct site testing, or any sampling of any material or media, including soil, surface water, or ground water unless Seller, in Seller's reasonable discretion, has approved in writing such testing, and sampling, the specific scope of work therefor, the consultant performing such work and other reasonable requirements including insurance and restoration requirements. Buyer shall provide Seller with copies of all reports, studies, site assessments, tests, or other written materials prepared by third party consultants in connection with any such testing or sampling of the Seller real property.

**2.12 Adjustments to Purchase Price.** At Closing, the Purchase Price shall be be reduced by an amount equal to the 2009 personal property taxes (the "Personal Property Taxes") plus the amount of the 2009 personal property taxes outstanding at the Eastgate location only multiplied by result of the number of calendar days from January 1, 2010 through the Closing Date divided by 365. If 2009 Personal Property Taxes have not been assessed on the Closing Date, the 2009 Personal Property Taxes shall be assumed to be the same as the persona property taxes assessed in 2008. Buyer shall be liable for all Personal Property Taxes for the years 2009 and 2010.

### ARTICLE III -- REPRESENTATIONS AND WARRANTIES OF SELLER

Except as disclosed by Seller to Buyer in writing or in the Disclosure Schedules attached hereto, Seller hereby represents and warrants to Buyer as of the date of this Agreement that:

**3.01. Company Existence and Power.** Seller is a limited partnership, duly formed, validly existing and in good standing under the laws of the State of Ohio.

**3.02 Disclaimer. BUYER AGREES THAT IT WILL PERFORM ALL EXAMINATIONS AND INVESTIGATIONS OF THE BUSINESS, THE PURCHASED ASSETS AND THE CONTRACTS, IT DEEMS NECESSARY, PRIOR TO MARCH 21, 2010, AND THAT BUYER WILL RELY SOLELY UPON SUCH**

EXAMINATIONS AND INVESTIGATIONS IN PURCHASING THE PURCHASED ASSETS. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT BUYER IS PURCHASING THE PURCHASED ASSETS "AS IS" AND "WHERE IS," AND WITH ALL FAULTS AND THAT SELLER IS MAKING NO REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE. BUYER AGREES THAT SELLER IS NOT LIABLE OR BOUND BY ANY GUARANTEES, PROMISES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PURCHASED ASSETS MADE OR FURNISHED BY ANY BROKER, EMPLOYEE, SERVANT OR OTHER PERSON REPRESENTING OR PURPORTING TO REPRESENT SELLER. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE COMPENSATION TO BE PAID TO SELLER FOR THE PURCHASED ASSETS HAS BEEN DECREASED TO TAKE INTO ACCOUNT THAT THE PURCHASED ASSETS ARE BEING SOLD SUBJECT TO THE FOREGOING DISCLAIMERS. BUYER AND SELLER AGREE THAT THE PROVISIONS OF THIS SECTION 3.02 SURVIVE THE CLOSING OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT.

## ARTICLE IV -- REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that:

**4.01. Corporate Existence.** Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Ohio. Buyer is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

**4.02. Authorization and Enforceability.** The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation by Buyer of the transactions contemplated hereby and thereby are within Buyer's legal power and authority and have been, or will be on or before the Closing Date, duly authorized by all necessary corporate action on the part of Buyer.

**4.03. Non-Contravention.** The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) contravene or conflict with the wishes of the Shareholders and Board of Directors of Buyer or (ii) contravene or conflict with or constitute a violation of any provision of any law, regulation, judgment, injunction, order or decree binding upon or applicable to Buyer. The execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby require no action by or in respect of, or filing with, any Governmental Authority other than compliance with any applicable requirements of securities laws or any necessary filings with the Bankruptcy Court.

**4.04. Consents.** No consent, approval, waiver or other action by any Person under any material contract, agreement, indenture, lease, instrument or other document to which Buyer is a party or by which it is bound is required or necessary for the execution, delivery and performance by Buyer of this Agreement or the Ancillary Agreements to which it is a party or the consummation of the transactions contemplated hereby or thereby.

**4.05.   Litigation.**  There are (i) no actions, suits, proceedings, or investigations pending or, to the Buyer's Knowledge, threatened against Buyer or its properties before any Governmental Authority (and, to Buyer's Knowledge, there is no reasonable basis therefor), (ii) to the Buyer's Knowledge, no actions, suits, proceedings or investigations are pending or threatened against its employees that may relate to their employment with, or conduct on behalf of, Buyer, and (iii) no actions, suits, proceedings, or investigations pending or, to the Buyer's Knowledge, threatened that question the validity of this Agreement or the Ancillary Agreements or the transactions contemplated hereby.

**4.06.   No Reliance**

    (a)    Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the financial condition, liabilities, results of operations and projected operations of Seller and the nature and condition of its properties, assets and businesses and, in making the determination to proceed with the transactions contemplated by this Agreement, has relied solely on the results of its own independent investigation and the representations and warranties set forth herein.

    (b)    In connection with Buyer's investigation of Seller, Buyer may receive from Seller and its Affiliates, agents and representatives certain projections and other forecasts, including but not limited to projected financial statements, cash flow items and other data of Seller.  Buyer acknowledges that there are uncertainties inherent in attempting to make such projections and other forecasts and plans and accordingly is not relying on them, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections and other forecasts and plans so furnished to it, and that Buyer and its Affiliates, agents and representatives shall have no claim against any Person with respect thereto.  Accordingly, Buyer acknowledges that neither Seller nor Seller's representatives, agents or Affiliates, have made any representation or warranty with respect to such projections and other forecasts and plans.

    (c)    In connection with Buyer's investigation of the Purchased Assets, Buyer has not received any information from Seller, its Affiliates, agents, representatives, or employees that is not available to other parties receiving information on the Purchase Assets pursuant to the Bid Procedures Order.

**4.07.   No Other Representations or Warranties.**  Except for the representations and warranties expressly provided in this Agreement, neither the Company nor any other Person on behalf of Seller or any of its Affiliates makes any express or implied representation or warranty with respect to Seller or any of its Affiliates or with respect to any other information provided to Buyer, its Affiliates, agents or representatives in connection with the transactions contemplated hereby. Neither Seller nor any other Person will have or be subject to any liability or other obligation to Buyer, its Affiliates, agents or representatives or any Person resulting from Buyer's use of, or the use by any of Buyer's Affiliates, agents or representatives of, any such information, including any information, documents, projections, forecasts of other material made available to Buyer, its Affiliates or representatives in certain "data rooms," offering memorandum or management presentations in expectation of the transactions contemplated by this Agreement. Except for the representations and warranties

expressly provided in this Agreement, Seller disclaims any and all other representations and warranties, whether express or implied.

## ARTICLE V -- COVENANTS OF SELLER

**5.01.   Notices of Certain Events.**  From the date hereof until the Closing Date, Seller shall promptly notify Buyer of any actions, suits, claims, investigations or proceedings commenced or, to the Knowledge of Seller, threatened, against Seller that affect the Purchased Assets or Seller's ability to consummate the transactions contemplated by this Agreement.

## ARTICLE VI -- OTHER AGREEMENTS

**6.01.   Commercially Reasonable Efforts Further Assurances.**  Subject to the terms and conditions of this Agreement, each of the Parties to this Agreement will use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement.  Seller and Buyer each agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement and to vest in Buyer good and valid title to the Purchased Assets.

**6.02.   Certain Filings.**  Seller and Buyer shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement, (b) in furnishing information required in connection with taking any such actions or making any such filings and (c) in seeking, in a timely manner, to take any such actions or obtain any such consents, approvals or waivers.

**6.03.   Maintenance of Seller Records; Sharing of Information.**  Buyer shall, for a period of five (5) years following the Closing Date, maintain all of the Records provided by Seller to Buyer hereunder. Seller shall have the right at any time during such period to have reasonable access to such for the limited purposes of administering the Chapter 11 Cases, concluding its involvement in the Business, preparing for the prosecution or defense of any claim, suit or proceeding, and complying with its obligations under applicable laws and regulations. During such five (5) year period, Seller shall be permitted to make copies of any such Records, at is sole costs and expense.

**6.04.   Employees.**   Seller acknowledges that Buyer is under no obligation to offer employment to any employees of Seller subsequent to Closing. To the extent any such employees are employed by Buyer following the Closing, such employment shall be on terms and conditions determined by Buyer, and Buyer shall have no obligation to offer such employees the same or similar wages, salaries or benefits as are paid or provided by Seller prior to the Closing.

**6.05.   Post-Closing Assistance and Inspection Rights.**  Buyer shall for a period of  six (6) months following the Closing Date provide Seller with access to its designated corporate accountant, and shall cause such person to reasonably assist the Seller in completing the financial records of Seller with respect to the period of January 1, 2009 through the Closing Date.  For such period, Buyer shall also provide Seller with access to its financial and

accounting data and other books and records covering such period through the Closing Date, as required by Seller to complete such financial records.  During the three-month period immediately following the Closing, Seller shall have the right to inspect and examine Buyer's books and records for the purposes of reviewing costs and expenses incurred and revenues received and deposited by Buyer during the period immediately prior to the Closing.  Such inspections shall occur during normal business hours upon prior written notice by Seller to Buyer and the Company and as approved by Buyer. Buyer shall cooperate with Seller in facilitating such inspections/examinations.

## ARTICLE VII -- CONDITIONS TO CLOSING

**7.01.  Bankruptcy Court Approval.**  The Parties agree that the Closing shall not occur unless and until the Sale Order is entered by the Bankruptcy Court approving this Agreement and authorizing and directing Seller to comply with the terms of this Agreement, including executing and delivering all necessary documents and instruments contemplated hereunder, pursuant to section 363 of the Bankruptcy Code. The Sale Order shall not be subject to any stay or injunction. The Sale Order shall provide, among other things, that:

(a)     All of the Purchased Assets sold to Buyer hereunder shall be transferred to Buyer free and clear of all liens, encumbrances and liabilities of any kind whatsoever, except as expressly provided in this Agreement; and

(b)     Buyer is not acquiring or assuming Seller's liabilities except as expressly provided in this Agreement, and is not subject to any successor liability for the liabilities and obligations of Seller.

(c)     All leases of Seller designated by Buyer on <u>Schedule 7.01(c)</u> shall have been assigned to, and assumed by, the Buyer by order of the Bankruptcy Court.

(d)     All agreements between the Seller and CiCi Enterprises, LP and/or its Affiliates designated by the Buyer on <u>Schedule 7.01(d)</u> shall have been assigned to, and assumed by, the Buyer by order of the Bankruptcy Court.

**7.02.  Conditions to Obligation of Buyer.**  The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following conditions, each of which is for the benefit of Buyer and any one or more of which may be waived by Buyer:

(a)     Seller shall have executed and delivered to Buyer the Bill of Sale.

(b)     Seller shall have executed and delivered to Buyer the Assignment and Assumption Agreement.

(c)     All sales taxes that are subject to valid lein claims shall be paid at Closing.

**7.03.  Conditions to Obligations of Seller.**  The obligation of Seller to consummate the Closing is subject to the satisfaction of the following conditions, each of which is for the benefit of Seller and any one or more of which may be waived by Seller:

(a)     The entry of the Sale Order by the Bankruptcy Court.

(b)     The representations and warranties of Buyer contained in this Agreement shall have been true and correct in all material respects at and as of the date hereof, and they shall be true and correct in all material respects at and as of the Closing Date with the same force and effect as though made at and as of that time (other than for representations and warranties that address matters only as of a certain date, which shall be true and correct in all material respects as of such certain date).  Buyer shall have performed and complied with in all material respects all of its obligations required by this Agreement to be performed or complied with at or prior to the Closing Date.

(c)     There shall not be pending or threatened any actions, suits, claims, governmental investigations or arbitration proceedings that challenge the validity of this Agreement or any action taken or to be taken in connection herewith or otherwise seeks to restrain, prohibit or invalidate the transfer of the Purchased Assets by Seller or any other transaction contemplated hereby.

(d)     Buyer shall have executed and delivered to Seller the Assignment and Assumption Agreement.

(e)     Buyer shall have delivered the Purchase Price in cash or other immediately available funds to Buyer.

## ARTICLE VIII -- SURVIVAL

**8.01.   Survival.**  Regardless of any investigation at any time (whether before or after the execution of this Agreement) made by or on behalf of any Party hereto or of any information any Party may have in respect thereof, any representations and warranties of Seller contained in this Agreement shall not survive the Closing.  The covenants contained in this Agreement that are performable in their entirety prior to or at Closing shall not survive the Closing, and the covenants that are able to be performed after Closing shall survive the Closing indefinitely until such are fully performed.

## ARTICLE IX -- TERMINATION

**9.01.   Grounds for Termination.**  This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Seller and Buyer;

(b)     by either Seller or Buyer if consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction;

(c)     by Seller if there has been (A) any material misrepresentation or breach by Buyer of any warranty, representation or agreement contained herein or (B) any failure on the part of Buyer to satisfy timely in any material respect any condition contained herein, if such breach or failure is not cured within ten Business Days of receipt of written notice thereof from Seller;

(d)     by either Buyer or Seller, if Closing has not occurred on or before April 30, 2010 (the "Termination Date"); provided, however, that the right to terminate

this Agreement under this Section 9.01(d) shall not be available (i) to Seller, if any breach of this Agreement by Seller has been the principal cause of, or resulted in, the failure of the Closing to occur on or before the Termination Date or (ii) to Buyer, if any breach of this Agreement by Buyer has been the principal cause of, or resulted in, the failure of the Closing to occur on or before the Termination Date.

**9.02. Effect of Termination.**

(a)     In the event of termination of this Agreement pursuant to Sections 9.01(a) or (b), Seller shall return the Earnest Money Deposit to Buyer.

(b)     If Seller terminates this Agreement pursuant to Section 9.01(c), Seller may retain the Earnest Money Deposit.

(c)     If Buyer terminates this Agreement pursuant to Section 9.01(d) Seller shall refund the Earnest Money Deposit to Buyer.

(d)     Other than the rights, remedies and payments set forth in Sections 9.02(a) upon a termination of this Agreement no Party to this Agreement shall have any further liability or obligation hereunder to the other Party hereto, except that Articles IX and X shall survive any such termination.

## ARTICLE X -- MISCELLANEOUS

**10.01. Amendment and Modification.**  The Parties hereto may only amend, modify and supplement this Agreement in writing.

**10.02. Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

**10.03. Entire Agreement.**  This Agreement, the Ancillary Agreements, any confidentiality agreements between the Parties in effect on or prior to the date hereof, and the appendices, exhibits and schedules attached hereto and thereto, contain the entire agreement of the Parties hereto with respect to the transfer of the Purchased Assets and the other transactions contemplated herein, and supersede all prior understandings and agreements of the Parties with respect to the subject matter hereof.  Any reference herein to this Agreement shall be deemed to include the schedules and exhibits attached hereto.

**10.04. Usage**

(a)     In this Agreement, unless a clear contrary intention appears (i) the singular number includes the plural number and vice versa; (ii) reference to any person includes such person's successors and assigns; (iii) reference to any gender includes each other gender; (iv) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (v) reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Legal

Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (vi) "hereunder", "hereof", "hereto" and words of similar import shall be deemed references to this agreement as a whole and not to any particular Article, Section or other provision thereof; (vii) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; (viii) "or" is used in the inclusive sense of "and/or"; (ix) with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and (x) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

(b)     Unless otherwise specified herein, all accounting terms used therein shall be interpreted and all accountings determinations thereunder shall be made in accordance with GAAP.

(c)     This Agreement was negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof.

**10.05.  Headings**.  The descriptive headings in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

**10.06.  Execution in Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together will constitute one and the same instrument.  Execution may be by facsimile or electronic signature or electronic document, such as pdf, bearing a signature.

**10.07.  Notices.**  Any notice, request, information or other document to be given hereunder to any of the Parties by any other Party shall be in writing and delivered personally or sent by certified or registered mail, postage prepaid, as follows:

If to Seller, addressed to:

Pizza Partners of Cincinnati, L.P.
c/o Marwin Management
9400 N. Central Expressway
Suite 1304
Dallas, TX 75234

With a copy to:

Richard W. Ward
6860 N. Dallas Parkway, Suite 200
Plano, TX 75024

If to Buyer, addressed to:

Awesome Restaurant Group, Inc.
c/o Bryan Jones, President
8058 Vegas Court
West Chester, Ohio 45069

**10.08   Governing Law/Consent to Jurisdiction.**   This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio applicable to contracts made and to be performed herein.  The Parties agree that any claim or dispute relating to or arising out of this Agreement or the transactions contemplated hereby shall be addressed solely by a state or federal court of competent jurisdiction in the State of Ohio, and the Parties hereby agree to subject themselves to the jurisdiction of such court for all such purposes and agree to waive any objections thereto.

**10.09   Relationship of Parties.**   Nothing in this Agreement shall constitute or be deemed to constitute a partnership between the Parties or constitute or be deemed to constitute any party hereto as agent of another party hereto, or its Affiliates, for any purpose whatever, and no Party hereto shall have authority or power to bind any other Party, or its Affiliates, or to contract in the name of or create a liability against any party hereto or its Affiliates, in any way or for any purpose.

**10.10   Assignment.**   No Party to this Agreement shall be entitled to transfer or assign its rights or obligations hereunder without the prior written consent of the other Party.  Any attempted assignment in violation of the foregoing shall be null and void.

**10.11   Waiver.**   A waiver by either of the Parties of any breach by the other Party of any of the terms, provisions or conditions of this Agreement or the acquiescence of either Party hereto in any act (whether commission or omission) which but for such acquiescence would be a breach as aforesaid, shall not constitute a general waiver of such term, provision or condition of any subsequent act contrary thereto.

**10.12   Severability.**   If any provision hereof is declared invalid by a court of competent jurisdiction or to be in violation of applicable laws such provision shall be ineffective only to the extent of such invalidity or such violation, so that the remainder of that provision and all remaining provisions of this Agreement will continue in full force and effect.

**10.13   Expenses.**   Except as otherwise expressly provided in this Agreement, each Party shall bear its respective fees and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby.

**10.14   No Third-Party Beneficiaries.**   This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF the Parties hereto here caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER:**

*Brian R. Hooter* (signature)

Brian R. Hooter, Esq., Legal Counsel for ARG, Inc.
Acting under color authority and consent by:

By:     Awesome Restaurant Group, Inc.
Name: Bryan Jones
Title:  President


**SELLER:**
Pizza Partners of Cincinnati, L.P.
        By: TEG Pizza GP, LLC, its general partner


By:     _____

        Norman Winton, manager

# EXHIBIT A

## ALLOCATION OF PURCHASE PRICE

1.  $166,666.67 total for all equipment and trade fixtures;

2.  $7,000.00 for all smallwares (plates, serving, eating, cooking utensils, etc.);

3.  $76,333.33 for all intangible assets such as goodwill, intellectual property rights, assigned contracts, etc.

Attached hereto and incorporated herein.

## EXHIBIT B

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, Pizza Partners of Cincinnati, L.P. (collectively "Assignor"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Assignee, does hereby sell, assign, transfer, convey, set over and deliver unto Awesome Restaurant Group, Inc., an Ohio corporation, ("Assignee"), all of Assignor's right, title and interest in and to the assets set forth on Exhibit A attached hereto (the "Assets").

Assignor does hereby bind itself and its successors and assigns to WARRANT AND FOREVER DEFEND, all and singular, title to said Assets unto Assignee, its successors and assigns, against every person lawfully claiming or to claim the same by, through, or under Assignor, but not otherwise.

THE INTEREST OF ASSIGNOR IN AND TO THE ASSETS IS CONVEYED BY ASSIGNOR AND ACCEPTED BY ASSIGNEE "AS IS" AND "WHERE IS" AND WITH ALL FAULTS, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESSED, IMPLIED, STATUTORY OF OTHERWISE, INCLUDING SPECIFICALLY, WITHOUT LIMITATION, WITHOUT IMPLIED WARRANTIES AS TO SUITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SAVE AND EXCEPT THE LIMITED WARRANTY OF TITLE CONTAINED HEREIN.

IN WITNESS WHEREOF, Assignor has caused this Bill of Sale to be executed as of _____, 2010.

# EXHIBIT C

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is entered into as of _____, 2010, by and between Pizza Partners of Cincinnati, L.P. (collectively "Assignor"), and Awesome Restaurant Group, Inc., an Ohio corporation, ("Assignee").

WHEREAS, Assignee and Assignor are parties to that certain Asset Purchase Agreement dated _____, 2010, (the "Purchase Agreement"), that provides, among other things, for the assumption by Assignee of the "Assumed Liabilities" (as defined in the Purchase Agreement); and

WHEREAS, in order to effectuate the assignment and assumption of the Assumed Liabilities, Assignor and Assignee are executing and delivering this Agreement.

NOW, THEREFORE, for and in consideration of the premises, the mutual covenants contained herein and in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby act and agree as follows:

**1.     Assignment.**    Assignor hereby assigns, conveys, transfers, and sets over unto Assignee, effective as of the date hereof, all of Assignor's rights, titles, and interests in, to and under the contracts described on Exhibit A attached hereto (the "Assumed Contracts"), and Assignee shall succeed to all of such rights, titles, and interests effective as of the date hereof.

**2.     Assumption.**    Assignee hereby accepts, assumes and agrees to pay, perform and discharge in accordance with terms thereof, all of the duties, liabilities and obligations of Assignor (i) arising under the Assumed Contracts and accruing or otherwise attributable to the time period from and after the date hereof or (ii) listed on Exhibit B attached hereto (the "Other Assumed Liabilities").

**3.     Indemnification**.    Assignee shall indemnify and hold harmless Assignor from and against (i) arising under the Assumed Contracts and accruing or otherwise attributable to the time period from and after the date hereof and (ii) the Other Assumed Liabilities.

**4.     Defined Terms.**    Terms not defined in this Agreement shall have the meanings set forth in the Purchase Agreement.

**5.     Binding Effect.**    This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto. The parties hereto shall execute and deliver such further and additional instruments, agreements, and other documents as may be necessary to evidence or carry out the provisions of this Agreement.

**6.     Governing Law and Venue.**    This Agreement is being executed and delivered, and is intended to be performed, in the State of Ohio, and the laws of the State of Ohio shall govern the validity, construction, enforcement and interpretation of this Agreement. This Agreement is performable in Dallas County, Texas, and the exclusive venue for any action brought with respect hereto, shall lie in the United States Bankruptcy Court in the Northern District of Texas.

**7.      Counterparts.**  This Agreement may be executed in any number of counterparts, and each counterpart shall be deemed to be an original instrument, but all such counterparts shall constitute one and the same instrument.

**8.      Controlling Agreement.**  It is contemplated that Assignor may, at any time or from time to time, execute, acknowledge and deliver one or more separate instruments of assignment and conveyance relating to the subject matter hereof no such separate instrument of assignment or conveyance shall limit the scope and effect of this Agreement. In the event that any conflict or ambiguity exists as between this Agreement and any such separate instrument of assignment or conveyance, the terms and provisions of this Agreement shall govern and be controlling.

**9.      Descriptive Headings.**  The descriptive headings of the several paragraphs, subparagraphs and clauses of this Agreement were inserted for convenience only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

        IN WITNESS WHEREOF, Assignor and Assignee have executed this Agreement on the date first written above.

# PROMISSORY NOTE

$50,000.00

_____, 2010

Awesome Restaurant Group, Inc.
8058 Vegas Court
West Chester, Ohio 45069

Bryan Jones
8058 Vegas Court
West Chester, Ohio 45069

Pizza Partners of Cincinnati, L.P.
9400 N. Central Expressway, Suite 1304
Dallas, Texas 75231

**PROMISE TO PAY.** Awesome Restaurant Group, Inc. and Bryan Jones, individually (collectively known as "Maker") promise to pay to the order of Pizza Partners of Cincinnati, L.P. or its assignee ("Holder"), in lawful money of the United States of America, at its office indicated above or wherever else Holder may specify, the sum of Fifty Thousand and No/100 Dollars ($50,000.00), with interest accruing on the unpaid principal balance at the rate equal to five percent per annum. If at any time the effective interest rate under this Note would, but for this paragraph, exceed the maximum lawful rate, the effective interest rate under this Note shall be the maximum lawful rate.

**PAYMENT.** Maker shall pay $25,000 in principal as well as any accrued and unpaid interest by six months after the execution of this Note. Payment of any remaining principal and accrued and unpaid interest shall be due one-year from the date of this Note's execution at Closing.

**SECURITY.** To secure payment of this Note, Maker has granted Holder a security interest in certain collateral as identified in the Security Agreement of even date (the "Security Agreement").

**PREPAYMENT ALLOWED.** This Note may be prepaid in whole or in part at any time. Any prepayment shall include accrued interest and all other sums then due under the Note. No partial prepayment shall affect the obligation of Maker to make any payment of principal or interest due under this Note on the date specified below in the Payment Terms paragraph of this Note until this Note has been paid in full.

**APPLICATION OF PAYMENTS.** Monies received by Holder from any source for application toward payment of the obligations under this Note ("Obligations") shall be applied to accrued interest and then to principal. If a Default occurs, monies may be applied in the following order at Holder's discretion to the Obligations: (1) expenses and costs of collection; (2) accrued interest; and (3) principal.

**DEFAULT.** If any of the following occurs, a default ("Default") under this Note shall exist: (1) Maker fails to timely pay any amount due under this Note; (2) Maker fails to maintain current level of insurance coverage or carries less than the insurance coverage required by CiCi's Pizza Enterprises, L.P., franchisor; or (3) an event of default occurs under the Security Agreement and is not timely cured in accordance with any applicable cure period.

**REMEDIES UPON DEFAULT.** If a Default occurs under this Note, Holder may at any time thereafter, take the following actions: **Holder Lien.** Foreclose its security interest upon thirty days notice with a cure period of thirty days. **Acceleration Upon Default.** Accelerate the maturity of this Note and, at Holder's option, any or all other Obligations, whereupon this Note and the accelerated Obligations shall be immediately due and payable; provided, however, if the Default is based upon a bankruptcy or insolvency proceeding commenced by or against Maker or any guarantor or endorser of this Note, all Obligations shall automatically and immediately be due and payable. **Cumulative.** Exercise any rights and remedies as provided under the Note and Security Agreement, or as provided by law or equity.

**ATTORNEYS FEES.** If any Holder of this Note retains an attorney in connection with any Default or at maturity to collect or enforce this Note in any lawsuit or in any probate, reorganization, bankruptcy, arbitration or other proceeding, or if Maker sues any Holder hereof in connection with this Note then Maker agrees to pay to each such Holder, in addition to principal, interest and any other sums owing to such Holder hereunder, all reasonable costs and expenses incurred by such Holder in trying to collect this Note or in any such suit or proceeding, including, without limitation, attorneys' fees and expenses, investigation costs and all court costs, whether or not suit is filed hereon, whether before or after the payment date, or whether in connection with bankruptcy, insolvency or appeal, or whether collection is made against Maker or any other person primarily or secondarily liable hereunder.

**WAIVERS AND AMENDMENTS.** No waivers, amendments or modifications of this Note or the Security Agreement shall be valid unless in writing and signed by an officer of Holder. No waiver by Holder of any Default shall operate as a waiver of any other Default or the same Default on a future occasion. Neither the failure nor any delay on the part of Holder in exercising any right, power, or remedy under this Note and Security Agreement shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Except to the extent otherwise provided by the Security Agreement or prohibited by law, each Maker and each other person liable under this Note waives presentment, protest, notice of dishonor, demand for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, notice of sale and all other notices of any kind.

**MISCELLANEOUS PROVISIONS. Assignment.** This Note and the Security Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, successors and assigns. Holder's interests in and rights under this Note and the Security Agreement are freely assignable, in whole or in part, by Holder.

**Organization; Powers.** Maker represents that Awesome Restaurant Group, Inc. is (i) a corporation, duly organized, validly existing and in good standing under the laws of its state of organization, and is authorized to do business in each other jurisdiction wherein its ownership of property or conduct of business legally requires such organization (ii) has the power and authority to own its properties and assets and to carry on its business as now being conducted and as now contemplated; and (iii) has the power and authority to execute, deliver and perform, and by all necessary action has authorized the execution, delivery and performance of, all of its obligations under this Note and the Security Agreement.

**Applicable Law; Conflict Between Documents.** This Note shall be governed by and construed under the laws of the state of Ohio without regard to that state's conflict of laws principles. If the terms of this Note should conflict with the terms of any loan agreement or any commitment letter that survives closing, the terms of the Asset Purchase Agreement shall

control.  **Severability.**  If any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note or other such document.

**Notices.**  Any notices to Maker shall be sufficiently given, if in writing and mailed or delivered to the Maker's address shown above or such other address as provided hereunder, and to Holder, if in writing and mailed or delivered to Holder at the address set forth above or such other address as Holder may specify in writing from time to time.  In the event that Maker changes Maker's address at any time prior to the date the Obligations are paid in full, Maker agrees to promptly give written notice of said change of address by registered or certified mail, return receipt requested, all charges prepaid.  **Plural; Captions.**  All references to Maker, guarantor, person, document or other nouns of reference mean both the singular and plural form, as the case may be, and the term "person" shall mean any individual, person or entity.

**IN WITNESS WHEREOF**, Maker, on the day and year first above written, has caused this Note to be executed.

> **MAKER**
>
> Awesome Restaurant Group, Inc.
> An Ohio Corporation
>
> By: _____
> Bryan Jones, President
>
> _____
> Bryan Jones, Individually

# EXHIBIT E

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is entered into as of the ___ day of _____, 2010 (the "Effective Date"), by and between Awesome Restaurant Group, Inc., an Ohio corporation with an address of 8058 Vegas Court, West Chester, Ohio 45069 (the "Debtor"), and Pizza Partners of Cincinnati, L.P., an Ohio limited partnership, with an address at 9400 North Central Expressway, Suite 1304, Dallas, Texas 75231 ("Secured Party").

### BACKGROUND

A.      Contemporaneously with the execution of this Agreement Debtor is acquiring from Secured Party certain assets used in connection with certain CiCi's Pizza restaurant franchises set forth in the Asset Purchase Agreement (the "Restaurants").

B.      As partial consideration for the purchase, Debtor is delivering to Secured Party a promissory note in the principal amount of $50,000 (the "Note").

C.      To secure payment of the Note, Debtor desires to grant to Secured Party, and Secured Party desires to acquire from Debtor, a security interest in certain collateral in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the conveyance of the assets, delivery of the Note, and other good and value consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### AGREEMENT

1.      Grant of Security Interest.  Subject to the terms and provisions contained herein, on the Effective Date, Debtor hereby grants to Secured Party a purchase money security interest in all of Debtor's right, title and interest in the collateral described herein (the "Collateral"), to secure payment of the Note.  For purposes of this Agreement, the term "Collateral" means and includes all accounts, chattel paper (whether electronic or intangible), instruments, leasehold improvements, promissory notes, documents, general intangibles, payment intangibles, software, letter of credit rights, fixtures, furniture, equipment; supplies; and inventory used in connection with the Restaurants, and all goods covered thereby, including all accessions, additions and improvements thereto and products thereof, wherever located, and all proceeds of any of the foregoing, whether arising from the sale, lease or other use or disposition thereof, including without limitation, all rights to payment with respect to any insurance, including returned premiums, or any claim or cause of action relating to any of the foregoing.

2.      Representations and Warranties of Debtor.  Debtor represents and warrants to Secured Party that the Collateral is not subject to any assignment, default, claim, setoff, lien, demand, or encumbrance of any nature.

3.      Covenants and Agreements of Debtor.

   a.   Debtor covenants and agrees to promptly pay all taxes and assessments of every nature which may be levied or assessed against the Collateral.

   b.   Debtor covenants and agrees not to transfer or attempt to transfer any interest in the Collateral.

c. Debtor covenants and agrees to keep the Collateral within the State of Ohio and free and clear of any liens or encumbrances (other than that created by this document).

d. Debtor covenants and agrees to operate and use the Collateral in compliance with all applicable laws, rules and regulations promulgated by any governmental entity.

e. Debtor covenants and agrees to use the Assets only in the ordinary course of business of operating the Restaurants. Debtor shall maintain the Collateral in good working order and shall not dispose of any Assets except in the ordinary course of Debtor's business.

f. Secured Party or its representative shall have the right to inspect the Restaurants premises at any time during business hours to ensure Debtor's compliance with the foregoing.

4. <u>Events of Default</u>. The following shall constitute "Events of Default" hereunder, and each such Event of Default shall also constitute an Event of Default under the Note, entitling Secured Party to exercise all or any of the remedies available to Secured Party under the terms of the Note and this Agreement.

a. Any breach or default by Debtor under the Note, including the failure by Debtor to pay any sum when due and payable under the Note.

b. The failure of Debtor to perform or observe, or other breach of, any other covenant, obligation, agreement, condition, prohibition, representation, warranty or any other term or provision hereunder.

c. Failure to maintain the Collateral at levels in force on the Closing Date and sufficient insurance protecting the Collateral's value from loss.

d. Termination of the Franchise Agreement.

5. <u>Cure by Secured Party</u>. Debtor agrees that Secured Party shall have the right, but not the obligation, to make any payment and take any action reasonably necessary to maintain, protect and preserve the Collateral, including, but not limited to, curing any late payment of taxes relating to the Collateral. Payment or action by Secured Party under this Section 4 shall not be deemed to cure any default by Debtor under the Note or this Agreement.

6. <u>Secured Party's Right Upon an Event of Default</u>.

e. Upon the occurrence of an Event of Default hereunder, Secured Party may declare all indebtedness secured hereby immediately due and payable and shall have all of the remedies of a secured party under the Uniform Commercial Code as enacted by the State of Ohio. Without limiting the foregoing, Secured Party shall be entitled to recover all of its costs and expenses incurred in enforcing its rights hereunder and under the Note, including reasonable attorneys' fees and costs.

f. The rights and remedies of Secured Party hereunder are cumulative and are not in lieu of, but are in addition to, any other rights or remedies which Secured Party may have under the Note, at law or in equity.

7. <u>Assignment of Secured Parties' Rights</u>. The rights of Secured Party under this Agreement may be assigned by it in connection with any assignment or

negotiation of the Note, and any such holder or assignee shall be entitled to rely upon the representations, warranties and covenants herein made.

8.    Further Assurances.  Debtor hereby agrees to execute such other documents and perform such other acts as may be deemed necessary or appropriate by Secured Party to perfect, protect or enforce the rights hereunder.

9.    Binding Effect.  The provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.   Amendment.  This Agreement may not be amended, modified, or changed, nor shall any waiver of any provision hereof be effective, except only by an instrument in writing and signed by the party against whom enforcement of any waiver, amendment, change, modification, or discharge is sought.

11.   Notices.  All notices permitted under this Agreement shall be in writing signed by the party giving same and shall be deemed effective upon personal delivery or three (3) days after mailing by certified or registered mail, postage prepaid, as follows:

        If to Debtor:

                Awesome Restaurant Group, Inc.
                8058 Vegas Court
                West Chester, Ohio 45069
                Attn:  Bryan Jones, President

        If to Secured Party:

                Pizza Partners of Cincinnati, L.P.
                9400 North Central Expressway, Suite 1304
                Dallas, Texas 75231
                Attention: Norman Winton

12.   Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio.

13.   Conflict between contracts.  To the extent that any provision of this Security Agreement conflicts with a provision of the Asset Purchase Agreement between the parties, the parties intend for the language of the Asset Purchase Agreement to govern.  This security agreement shall not be interpreted to modify, revise, amend, revoke, or supercede any provision of the Asset Purchase Agreement.  The parties have entered into this Security Agreement as a collateral transaction in order to fulfill the performance requirements of the Asset Purchase Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**DEBTOR:**

AWESOME RESTAURANT GROUP, INC.
An Ohio Corporation

By: _____
       Bryan Jones, President

**SECURED PARTY:**

PIZZA PARTNERS OF CINCINNATI, L.P.,
An Ohio Limited Partnership

By its General Partner
Pizza Properties, Inc.
A West Virginia Corporation


By:_____
       Norman Winton, President