J. Stephen Ravel
Texas Bar I.D. 16584975
Clay M. Taylor
Texas Bar I.D. 24033261
C. Josh Osborne
Texas Bar I.D. 24065856
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:       817/332-2500
Telecopy:        817/878-9280

COUNSEL FOR THE FROST NATIONAL BANK

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| WINMAR PIZZA, L.P., *et al.* | § | Case No. 09-33027-BJH-11 |
| | § | |
| Debtors-in-Possession | § | (Jointly Administered) |

DISCLOSURE STATEMENT
FILED BY THE FROST NATIONAL BANK
ON APRIL 5, 2010

IMPORTANT NOTICE

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. PRIOR TO SUCH APPROVAL BY THE BANKRUPTCY COURT, DISTRIBUTION OF THE DISCLOSURE STATEMENT IS FOR THE SOLE PURPOSE OF COMPLYING WITH ESTABLISHED PROCEDURES FOR OBTAINING APPROVAL OF THE DISCLOSURE STATEMENT AND NOT FOR THE PURPOSE OF SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN.**

# SUMMARY OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................3

II.     REPRESENTATIONS .........................................................................................5

III.    FINANCIAL PICTURE OF THE DEBTORS ....................................................6

        A.      FINANCIAL HISTORY AND BACKGROUND OF THE DEBTOR ..................6

        B.      OPERATIONS IN CHAPTER 11 ...............................................................7

        C.      SOURCES OF ADDITIONAL FINANCIAL DATA ........................................11

IV.     SUMMARY OF PLAN OF REORGANIZATION .............................................11

        A.      CLASSIFICATION AND TREATMENT OF CLASSES UNDER PLAN ..........14

        B.      MECHANICS/IMPLEMENTATION OF PLAN ..............................................19

        C.      FEASIBILITY OF THE PLAN ...................................................................21

        D.      CLAIMS ALLOWANCE PROCEDURE .......................................................21

        E.      RETENTION OF JURISDICTION ..............................................................23

V.      ALTERNATIVES TO FROST'S PLAN ...........................................................25

VI.     RISKS TO CREDITORS UNDER FROST'S PLAN ........................................25

VII.    CREDITORS' REMEDIES UPON DEFAULT .................................................25

VIII.   TAX CONSEQUENCES ....................................................................................26

        A.      TAX CONSEQUENCES TO DEBTORS .......................................................26

        B.      FEDERAL INCOME TAX CONSEQUENCES TO CREDITORS ....................28

IX.     EXECUTORY CONTRACTS AND LEASES ..................................................29

X.      CONCLUSIONS.................................................................................................29

## I.    INTRODUCTION

Winmar Pizza, L.P. filed a Voluntary Petition for Reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") on June 15, 2009 (the "Filing Date").  Subsequently, on June 28, 2009, Pizza Foods of Texas, L.P.; Pizza Partners of Florida, L.P.; Pizza Partners of Indiana, L.P.; Pizza Partners of Maryland, L.P.; Pizza Partners of Ohio, L.P.; Pizza Partners of South Carolina, L.P.; TEG Pizza Partners Holdings, L.P.; TEG Pizza Partners of Texas, L.P.; Pizza Partners of West Virginia, Limited Partnership; and Pizza Partners of Cincinnati, L.P. each filed Voluntary Petitions for Reorganization under Chapter 11 in the Court.  The eleven entities named above shall hereinafter be referred to collectively as the "Debtors."  All of these cases were consolidated for procedural purposes on July 2, 2009.  Since filing, the Debtors have operated their businesses as Debtors-in-Possession pursuant to § 1108 of the Bankruptcy Code.

The purpose of this Disclosure Statement is to provide such information as will enable a hypothetical, reasonable creditor typical of the holders of such claims to make an informed judgment in exercising his, her, or its right either to accept or reject the proposed Plan of Reorganization filed concurrently with this Disclosure Statement (the "Plan").  Notice of the date of the hearing on the Disclosure Statement will be sent by the Clerk of the Court.

After approval of this Disclosure Statement, a copy of the approved Disclosure Statement, the proposed Plan, and a ballot will be provided to each party on the mailing matrix.  Notice of the dates of the ballot deadline and the confirmation hearing on the Plan will also be provided.  Whether or not you expect to be present at the hearing, you are urged to fill in, date, sign, and properly mail the ballot to:

Kelly Hart & Hallman, LLP
Attn. Clay Taylor
201 Main Street, Suite 2500
Fort Worth, Texas 76102

Your acceptance of the Plan is important.  In order for the Plan to be deemed "accepted" by creditors and interest holders, at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the allowed claims voting in each class must accept the Plan and at least two-thirds (2/3) in the amount of allowed interests voting in each class must accept the Plan.

In the event the requisite acceptances are not obtained, the Plan may nevertheless be confirmed by the Court pursuant to the provisions of 11 U.S.C § 1129.  Those provisions may permit confirmation in spite of a rejecting class (or classes) if the Court finds that the Plan provides fair and equitable treatment to the rejecting class or classes and meets other tests.

"Fair and equitable" with respect to secured claims is defined as a Plan which provides: (1) that the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of such claim receive deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the Effective Date[1] of the Plan, of at least the value of such holder's interest in the estate's interest in such property; (2) for the sale of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (3) for the realization by such holders of the indubitable equivalent of such claim.

Unsecured claims are considered to receive fair and equitable treatment if:  (1) the Plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date of the Plan, equal to the allowed amount of such

---

[1] "Effective Date" means the first business day on which no stay of the Confirmation Order is in effect that is after ten (10) days (as calculated in accordance with Bankruptcy Rule 9006(a)) following entry of the Confirmation Order.

claim; or (2) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest in any property.

In the event one or more classes of impaired claims rejects the Plan, the Bankruptcy Court will determine at the hearing for confirmation of the Plan whether the Plan is fair and equitable and whether the Plan discriminates unfairly against any rejecting impaired class of claims. If the Bankruptcy Court determines that the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims, the Bankruptcy Court can confirm the Plan over the objection of any impaired class.

CONFIRMATION OF THE PLAN WILL DISCHARGE THE REORGANIZED DEBTORS FROM ALL ITS PRE-FILING DATE DEBTS AND INTERESTS OF INTEREST HOLDERS BY VIRTUE OF THE ORDER OF CONFIRMATION AND § 1141(d) OF THE BANKRUPTCY CODE, EXCEPT AS PROVIDED FOR SPECIFICALLY IN THE PLAN. CONFIRMATION MAKES THE PLAN BINDING UPON THE REORGANIZED DEBTOR AND ALL CREDITORS AND OTHER PARTIES-IN-INTEREST, REGARDLESS OF WHETHER OR NOT THEY HAVE ACCEPTED THE PLAN. IN ADDITION, PURSUANT TO § 1141(d)(1)(B) OF THE BANKRUPTCY CODE, CONFIRMATION OF THE PLAN WILL RESULT IN THE TERMINATION OF ALL RIGHTS AND INTERESTS OF CREDITORS AND INTEREST HOLDERS OF THE DEBTORS AS PROVIDED IN THE PLAN, AND THE RESERVED INTEREST AND EXCLUDED ASSETS OF THE REORGANIZED DEBTORS WILL REMAIN THE PROPERTY OF THE REORGANIZED DEBTORS FREE AND CLEAR OF ALL CLAIMS AND INTERESTS OF CREDITORS AND OF EQUITY SECURITY HOLDERS.

## II.    REPRESENTATIONS

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED BY THE FROST NATIONAL BANK, UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES. THE INFORMATION CONTAINED HEREIN IS BASED ON INFORMATION SUPPLIED BY THE DEBTORS AND IS UNAUDITED, UNLESS SPECIFICALLY STATED OTHERWISE.

THE FROST NATIONAL BANK RECOMMENDS THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN WHICH IS NOT CONTAINED IN THIS STATEMENT NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN. ANY REPRESENTATION OR INDUCEMENT MADE TO YOU NOT CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEYS FOR THE FROST NATIONAL BANK WHO SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

THE FROST NATIONAL BANK HAS MADE EVERY EFFORT TO PROVIDE ACCURATE INFORMATION. THIS STATEMENT CONTAINS ONLY A SUMMARY OF

THE PLAN.  THE PLAN WHICH WAS FILED WITH THIS DISCLOSURE STATEMENT IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND EACH CREDITOR IS URGED TO REVIEW THE PLAN PRIOR TO VOTING ON IT.

THE FROST NATIONAL BANK MAKES NO REPRESENTATIONS WITH RESPECT TO THE EFFECTS OF TAXATION (STATE OR FEDERAL) ON THE INTEREST HOLDERS OR CREDITORS WITH RESPECT TO THE TREATMENT OF THEIR CLAIMS OR INTERESTS UNDER THE PLAN, AND NO SUCH REPRESENTATIONS ARE AUTHORIZED BY THE FROST NATIONAL BANK.  CREDITORS AND INTEREST HOLDERS ARE ENCOURAGED TO SEEK THE ADVICE OF THEIR OWN PROFESSIONAL ADVISERS IF THEY HAVE ANY SUCH QUESTIONS.

THE PRESENT CONDITIONS OF DEBTOR ARE REFLECTED IN THIS DOCUMENT, OR IN FUTURE AMENDED FORMS, AND NECESSARILY REQUIRED CHANGES TO THE ORIGINALLY FILED SCHEDULES.

THE COURT'S APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THE DISCLOSURE STATEMENT OR PLAN, NOR DOES IT CONSTITUTE AN ENDORSEMENT OF THE PLAN ITSELF.

Projections by The Frost National Bank as to future operations are based on the best estimates in light of current market conditions, past experiences, financing which can reasonably be anticipated to be available, and other factors, all of which are subject to change and any of which may cause the actual results to differ from those projected.  A successful Chapter 11 is dependent on a two-step process.  The Court must approve the Disclosure Statement in the first step.  After such approval, The Frost National Bank will mail all creditors a copy of the approved Disclosure Statement and a copy of the proposed Plan of Reorganization, along with a ballot, so that each creditor may accept or reject the Plan.  The process of bankruptcy is not complete until the Court has confirmed the Plan.

## III.    FINANCIAL PICTURE OF THE DEBTORS

### A.    <u>Financial History and Background of the Debtor</u>

Prior to these filings, the Debtors operated a number of CiCi's Pizza restaurants as franchisees.  Each distinct restaurant was the subject of a Franchise Agreement between the respective debtor and CiCi Enterprises, LP (or an affiliate) ("CiCi Enterprises").  The Debtors did not own the locations of any of these restaurants, but instead leased the property from a

distinct lessor at each location.

Management of the Debtors was centralized in Marwin Management, LLC. ("Marwin"). By various agreements with the Debtors, Marwin performed all management related tasks for the respective debtor, including both administration and accounting. Pursuant to these agreements, each debtor paid Marwin between 1% and 3% of gross sales for each restaurant, plus $30,000 per restaurant annually in exchange for these services.

In 2007, the Debtors consolidated ownership in Pizza Master Holding Partnership, Ltd., and, in connection therewith, consolidated loans from The Frost National Bank ("Frost") to the Debtors. The loan consolidation resulted in Pizza Master Holding Partnership, Ltd. executing and delivering to Frost a Term Note with an outstanding principal balance of $19,000,000. The promissory note was secured by a lien on the majority of the Debtors' assets and was guaranteed by each of the Debtors (among others), save for Pizza Partners Pizza Partners of Indiana, L.P.

In the years following, Debtors operating revenue declined annually and Debtors began struggling to make payments as they became due. Revenue of around $72 million in 2006 turned into approximately $64 million in 2007 and $53 million in 2008. In response, the Debtors closed certain of their less profitable stores and began attempting to sell the remainder. In addition, they orally modified their agreements with Marwin. Rather than paying a percentage of gross sales and an annual duty, the Debtors began paying Marwin's actual costs on a pro-rata basis. The efforts at rehabilitation were largely unsuccessful. The Debtors filed for bankruptcy protection in the early to mid part of 2009.

### B.    Operations in Chapter 11

Since the Filing Date, Debtors' management has continued operations as Debtors-in-Possession. Early on, the Debtors sought authority to use Frost's cash collateral to continue operations. In exchange, the Debtors granted Frost a post-petition security interest in virtually all

of their assets.  Upon filing, the Debtors operated 58[2] CiCi's Pizza restaurants across seven states with annual sales of around $40 million.  The contracts with Marwin continue as orally modified—with the Debtors paying management's actual costs on a pro-rata basis.

The primary goal continues to be preservation of the going-concern value of these entities until such time as the assets may be liquidated at a higher value that the current fire-sale process that has become the norm in today's restaurant financing environment.  To that end, the Debtors have conducted three auctions, none of which have been successful in garnering fair-market value for Debtors' assets.  Throughout this process, Debtors operating revenue has ebbed and flowed.  The inconsistent numbers appear to have affected the valuation of the Debtors' assets.

In July of 2009, Debtors filed their first Motion for Order authorizing a public auction for the sale of substantially all of Debtors' assets [Docket No. 64], which was approved by the Court on August 14, 2009 [Docket No. 93].  However, the auction proved unsuccessful due to a lack of qualifying bids, save for a bid limited to the assets of Pizza Partners of South Carolina, L.P. Pizza Partners of South Carolina, L.P. operates two restaurants—stores 213 and 297.  On November 17, 2009, the Court entered an order authorizing the sale of these two stores, including the franchise agreement rights, to MBTL, Inc. for the purchase price of $1,030,000 subject to certain adjustments [Docket No. 221].  This sale has closed and the proceeds have been distributed.

As for the remaining assets, the Debtors determined to segregate the majority of their assets—those of Winmar Pizza, LP, Pizza Foods of Texas, L.P., TEG-Pizza Partners of Texas, L.P., TEG Pizza Partners Holdings, L.P., and Pizza Partners of Maryland, L.P.—and auction them separately from what they have termed the "outlier" entities.  The Debtors would attempt to

---

[2] A very small number of these were actually operated by prospective purchasers when the Debtors filed for bankruptcy and this arrangement continued after the Filing Date.

sell the assets of the outlier entities—Pizza Partners of Cincinnati, L.P., Pizza Partners of Ohio, Ltd., Pizza Partners of West Virginia, Limited Partnership, TEG-Pizza Partners of Indiana, L.P. and Pizza Partners of Florida, Limited Partnership—on an individual basis.

With respect to the sale of the assets of these outlier entities, the Debtors have proposed a sale of the assets of Pizza Partners of West Virginia, Limited Partnership for $216,650 in cash and $233,350 in assumed sales taxes [Docket No. 304]. These assets include stores 489, 560, and 562. The Court has yet to approve this sale. The Debtors have also proposed the sale of the assets of Pizza Partners of Cincinnati, L.P., which include stores 565 and 633, for $226,000[3] [Docket No. 363]. The Court has yet to approve this sale. The Debtors have also proposed a sale of the assets of Pizza Partners of Ohio, Ltd. and TEG Pizza Partners of Indiana, L.P. to M&M Pizza of Ohio Corp., Inc. [Docket No. 373]. The offer for the assets of Pizza Partners of Ohio, Ltd., which include stores 420, 438, 462, 478, 546, and 636, is $734,000.[4] The offer for the assets of TEG Pizza Partners of Indiana, L.P., which include stores 351, 355, 360, 556, and 635, is $30,000 plus the assumption of tax liabilities owed to the State of Indiana. The Court has yet to approve these sales. The Debtors have yet to propose a sale for the assets of Pizza Partners of Florida, Limited Partnership.

The lion's share of Debtors' assets, however, remain situated in Winmar Pizza, LP, Pizza Foods of Texas, L.P., TEG-Pizza Partners of Texas, L.P., TEG Pizza Partners Holdings, L.P., and Pizza Partners of Maryland, L.P. The Debtors attempted a second auction of these assets, separate from the outlier assets, in November of 2009. Awesome Acquisition Company, an entity affiliated with CiCi Enterprises, was the highest bidder, having submitted a bid of $11.5

---

[3] More specifically, the estate would receive $126,000 in cash, $50,000 in the form of a promissory note, and the remaining balance would be credited on account of payments delivered pre-petition.

[4] More specifically, the estate would receive $400,000 in cash and a promissory note for the amount of the difference between $334,000 and the outstanding sales tax liabilities owed to the State of Ohio.

million.  However, the Debtors speculated that the uncertainty surrounding the large amount of cure costs being claimed by CiCi Enterprises in the period of time leading up to this second auction chilled the bidding process at this auction.

Around this same time, Frost, CiCi Enterprises, and the Debtors reached a settlement agreement that resulted in a cap on the amount of CiCi Enterprises cure costs and the amount of money a prospective purchaser would need to spend in order to bring the stores into compliance with CiCi Enterprises' franchise agreements.  With the cap in place, the Debtors decided to walk away from the Awesome Acquisition Company bid, and instead to conduct a third auction.

This third auction was conducted outside of the Court's supervision.  This time, the Debtors' requested sealed bids, on standard-form asset purchase agreements.  The bid deadline was December 22, 2009.  At the conclusion of this auction, the Debtors designated McMullin Investments, LP ("McMullin") as the high bidder.

On December 24, 2009, the Debtors filed a Motion seeking approval of the sale of their assets to McMullin for $12.65 million [Docket No. 280].  On January 20, 2010, Mucho Pizza, LLC ('Mucho Pizza") filed an Objection to the Sale Motion [Docket No. 315], on the grounds that it had actually submitted a higher bid at the sealed auction.  In the Objection to the Sale Motion, Mucho Pizza affirmed its continued willingness to stand by its offer of $12.9 million.

Following this revelation, McMullin breached its asset purchase agreement by failing to provide the necessary adequate assurance proof by the date required.  Without such proof, a sale to McMullin could not occur.  The Debtors accordingly terminated the McMullin asset purchase agreement and commenced a declaratory judgment adversary proceeding against McMullin that seeks to retain the earnest money deposit submitted by McMullin.

The Debtors then turned their attention to Mucho Pizza and accepted their $12.9 million bid.  However, Mucho Pizza and the Debtors subsequently engaged in further negotiations,

which resulted in the $12.9 million earnest money contract being reduced to an $11 million contract.   As a result of this significant reduction—a reduction Frost does not believe is supported by Debtors' operating numbers—Frost refused to consent to the sale to Mucho Pizza for $11 million—though it informed the Debtors, CiCi Enterprises, and the prospective purchasers that if the offer were increased to $11.7 million, it would consent.  This did not occur.

Accordingly, the Debtors remain in possession of the majority of their bankruptcy assets—those owned by Winmar Pizza, LP, Pizza Foods of Texas, L.P., TEG-Pizza Partners of Texas, L.P., TEG Pizza Partners Holdings, L.P., and Pizza Partners of Maryland, L.P.  The prospect of maximizing the value of these assets for the benefit of the estate and its creditors remains.

### C.    Sources of Additional Financial Data

The Debtor's Bankruptcy Schedules, Statement of Affairs, and monthly reports of operation since the Bankruptcy filing are available on PACER.[5]  These reports as well as weekly cash reports beginning in August of 2009 are also available by contacting the attorneys for Frost.

## IV.   SUMMARY OF PLAN OF REORGANIZATION

Milo Segner, a qualifying Chapter Eleven Trustee, shall be appointed Liquidating Chapter 11 Trustee (the "Trustee").  He shall contract with Apex Restaurant Group ("Apex") to provide industry expertise in operating and ultimately liquidating the Debtors' remaining 39 CiCi's Pizza franchises in Texas and Maryland, as well as its lone franchise in Florida if

---

[5] Public Access to Court Electronic Records (PACER) is an electronic public access service that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index via the Internet. Links to all courts are provided from this web site: http://pacer.psc.uscourts.gov. Electronic access is available by registering with the PACER Service Center, the judiciary's centralized registration, billing, and technical support center.   Each court maintains its own databases with case information. Because PACER database systems are maintained within each court, each jurisdiction will have a different URL. Accessing and querying information from each service is comparable; however, the format and content of information provided may differ slightly.  PACER is a service of the United States Judiciary. The PACER Service Center is operated by the Administrative Office of the United States Courts.

acceptable terms can be reached.  Tony Eiserman shall be retained as a key Debtor employee, will serve as "operating principal" (a defined term under CiCi Enterprises' franchise agreements), and will work under the day to day direction of Apex.  Apex will be responsible to the Trustee, and shall concentrate initially on implementing a series of cost controls, local store marketing programs and operations enhancements, all of which are expected to increase overall profitability in excess of $400,000.00 over the balance of the current year.  In addition, Apex shall assist the Trustee in evaluating the Debtors' current management structure and human resources with the goal of leveraging Apex systems and personnel to reduce current levels of G&A.

In many ways, the first 90 days of the confirmed plan period will be conventional.  Fee applications will be filed with the Trustee, and he shall distribute these filed applications to attorneys for Frost and CiCi Enterprises.  If no agreement can be reached by all parties as to the reasonableness and necessity of the requested fees, each party shall file a brief (of no more than 10 pages) either in support or opposition to the fee application and set the matter for hearing and decision by this Court.  The Trustee will have a 20 days from the Effective Date to object to administrative claims, cure costs, and priority unsecured claims, 60 days from the Effective Date to object to general secured and unsecured claims, and 20 days from the government claim filing bar date to object to Priority Tax Claims.  In addition to this typical bankruptcy work, the above-described efficiency and enhanced profitability goals will be pursued by the Trustee, Apex, and Mr. Eiserman in the operation of the Debtors' assets.  All of the Debtors' remaining assets will operate in the ordinary course of business and in material compliance with the requirements of the CiCi Enterprises' franchise agreements and their respective real property leases.  They shall pay or reserve for taxes in the ordinary course of business, and pay interest only at the contract rate on the outstanding principal of Frost's secured claim.  The cure cost compromise [Docket

No. 262] continues in full force and effect after confirmation.   Under the Plan, the Trustee succeeds to all rights (including but not limited to contractual and statutory rights) of the Debtors in leases and franchise agreements.   The parties to executory contracts and unexpired leases will be provided with adequate assurance materials by the Trustee upon approval of the Disclosure Statement, and each party that is not satisfied that it has adequate assurance of future performance has 15 days from the date of service of the adequate assurance materials to object. Prior to the confirmation hearing, the Plan proponent shall set such objections for hearing if no agreement can be reached with the objecting party.   Thirty days after the claims objection deadline, all general unsecured claims that have not been objected to shall receive a pro-rata portion of $30,000.00[6] of their allowed amount payable from operating revenues.

The procedures for sales of further business assets under the Plan are very specific.   The Trustee shall continue to market the Debtors' business units as he deems appropriate.   When the Trustee decides that a sale of the assets is appropriate, he shall notify the parties to executory contracts and unexpired leases to be assigned and file notice with the Court.   The Plan provides that franchisor's and landlords' right to object to such subsequent sales by the Trustee is limited to the issue of adequate assurance under 11 U.S.C. § 365.   The Court retains jurisdiction to conduct hearings on adequate assurance.   Frost's absolute right under 11 U.S.C. § 365 to object to any sale that does not pay it in full is modified as follows:   For the first 180 days after confirmation, Frost may only reject any proposed sale of the Debtors' assets in Texas and Maryland if the net proceeds of such an offer (before reduction for the amount owed CiCi Enterprises under the cure cost compromise) is less than a combined $13 million.   If a sale of these assets is proposed that will net $13 million or more (before payment owing to CiCi

---

[6] This amount is estimated to be around 5% of allowed general unsecured claims based on the aggregate amount of proofs of claims filed.

Enterprises is subtracted) with a closing date within 180 days of the date of confirmation, Frost loses its absolute right to reject the sale.  Frost will be deemed to have consented to a sale of the Texas and Maryland assets if that sale closes within 180 days of the date of confirmation and the sale nets $13 million or more (after taking into account all sales costs save and except for the amount owed CiCi Enterprises under the cure cost compromise).

Gross proceeds of the sale of the Debtors' Texas and Maryland assets shall fund the balance of the creditor distributions as described in the claims treatment section of the plan and are briefly described as follows:  Sales proceeds shall first satisfy the requirements of the cure cost compromise order and any outstanding administrative claims.  Net proceeds shall then be distributed 100% to Frost.  If the sale proceeds exceed $13 million after payment of all sales costs and any outstanding administrative claims but before payment to CiCi Enterprises under the cure cost compromise order, 10% of the amount by which sales proceeds (calculated in this manner) exceed 13 million shall be paid pro-rata to the general unsecured claimants, with Frost retaining the remaining 90% of the amount over $13 million.

If the proposed sales of the assets of the outlier entities do not close, the Trustee shall attempt to effectuate the sale of these assets, as well as the assets of Pizza Partners of Florida, Limited Partnership.  Proceeds shall be paid in accordance with the cure cost compromise [Docket No. 262].

### A.    Classification and Treatment of Classes under Plan

### Class 1        Administrative Claims

Administrative claims for professional fees which occurred prior to confirmation, and for which application is made, shall be paid in full or as the same are allowed, approved, and ordered paid by the Court. The Trustee's attorneys' fees incurred post-confirmation may be paid by the Debtors in the ordinary course of business without prior approval by the Court.  In addition, fees

and expenses incurred by the Trustee unrelated to the Plan and in the ordinary course of business will be paid from the proceeds of ongoing operations without prior approval by the Court.

The Debtor shall pay to the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) on the Effective Date of the Plan of Reorganization and simultaneously provide to the United States Trustee an appropriate affidavit indicating cash disbursements for the relevant period. Quarterly payments will be paid through the quarter the Plan is dismissed, converted, or the case closed, or sooner as provided by law.

This class of claimants also includes claims which have arisen between the Petition Date and the Confirmation Date, including post-petition tax claims. To date, seven taxing authorities have filed such claims in an amount totaling approximately $15,832.24.[7] To the extent these remain unpaid, within 20 days of confirmation, the Trustee shall either pay these claims or object to any claim with which he disagrees. Objected to claims shall be paid as allowed, approved, and ordered paid by the Court. Future tax liabilities shall be paid in the ordinary course of business without the need for prior approval by the Court.

Class 1 is not a true class and is neither impaired nor unimpaired.

**Class 2**        **Executory Contract Administrative Claims**

CiCi Enterprises, LP, the franchisor of assumed franchise agreements, and various other entities,[8] the landlords of assumed unexpired leases, are entitled to cure cost payments due to the

---

[7] These filing taxing authorities include Montgomery County, Harris County, Galveston County, Fort Bend County, Polk County, Angelina County, and Cypress-Fairbanks Independent School District.

[8] These entities include: Fuqua Business Center, LP (landlord for Store 80); Petereit Investments, Inc. (landlord for Store 45); Lake Jackson Brazos Square LTD (landlord for Store 91); Reprise, Ltd. (landlord for Store 118); JK Woodbine, LP (landlord for Store 126); Weingarten Realty Investor (landlord for Stores 142 & 616); MB Houston Antoine Limited Partnership (landlord for Store 441); Bohica Holdings, Ltd. (landlord for Store 449); Riverway Commercial Development, LLC (landlord for Store 548); Hunting Bayou, LP (landlord for Store 605); Chouong To (landlord for Store 678); Festival Properties, Inc. (landlord for Store 57); VIF Kingwood S/C Partners LP (landlord for Store 107); Fairway 35, LLC (landlord for Store 132); Harold A. Clark & Company (landlord for Store 164); Porter Retail Center, Ltd. (landlord for Store 389); Jack G. Jackson (landlord for Store 464); Weingarten/Lufkin Inc. (landlord for Store 59); CFP I LTD (landlord for Store 43); EQYInvest Owner II, Ltd., LLP (landlord for Store 46);

Debtors' assumption of franchise agreements and unexpired leases. By Court order, the Debtors should have already cured all of the assumed leases. [Docket Nos. 265 & 331]. To the extent this has not occurred, within 20 days of the Effective Date, the Trustee shall either make cure payments or object to any cure claim with which he disagrees.[9] Objected to claims shall be paid as allowed, approved, and ordered paid by the Court. Also by Court Order, CiCi Enterprises' cure costs are fully liquidated and scheduled to be paid out of liquidation proceeds by agreement [Docket No. 262]. This cure cost compromise remains in full force and effect. The Trustee shall pay CiCi Enterprises' cure costs as detailed therein. Until the assets are sold, the Trustee shall keep the franchises and leases current in accordance with their terms. The Court retains jurisdiction to adjudicate disputes between the Trustee and the franchisor and/or the landlords and to hear adequate assurance related issues. The Trustee may sell assets subject only to a showing of adequate assurance under the standards set out in 11 USC § 365.

Class 2 is impaired.

---

Galileo Apollo I TX, LP (landlord for Store 62); Gesner Place – MetroNational Corporation (landlord for Store 86); Houston Village Green Plaza (landlord for Store 87); Kimco Realty Corporation (landlord for Store 121); Conroe Crossroads Center, LP (landlord for Store 123); Houston Pacific Trust (landlord for Store 127); Northline Commons (landlord for Store 133); Unified Commercial Properties LLC (landlord for Store 193); Texas Grouper, Inc. (landlord for Store 261); Westheimer Blue Willow, Ltd (landlord for Store 347); GPM Houston Properties, LTD (landlord for Store 358); Northwest Tidwell, Ltd (landlord for Store 363); Saul Holdings LTD (landlord for Store 459); JBG/Pike Center, L.L.C. (landlord for Store 465); Levin Management Corporation (landlord for Store 477); Inland US Management, LLC / Bldg.#6137 (landlord for Store 517); Federal Realty Investment Trust (landlord for Store 534); Forty West LLC (landlord for Store 573); WP San Souci Associates, LLC (landlord for Store 643); Regency Realty Group, Inc. (landlord for Store 386); Turfway Investment Group, LLC (landlord for Store 633); MB Land Company (landlord for Store 652); Jubilee-Springdale, LLC (landlord for Store 543); HK New Plan Exchange Property Owner II, LP (landlord for Store 564); VH Deerfield, LLC (landlord for Store 608); WESTPOINTE PLAZA – Castro (landlord for Store 420); Morse & Hamilton, L.P. – Castro (landlord for Store 438); Northridge Crossing LP – Castro (landlord for Store 462); 256 Center, LLC (landlord for Store 478); Dublin Oaks Limited – Castro (landlord for Store 546); Falls Creek Development – Grove City LLC (landlord for Store 636); Lafayette Associates (landlord for Store 351); Century Development Co. (landlord for Store 355); Washington Corner (landlord for Store 360); International Square, LLC (landlord for Store 566); Winbrook Management (landlord for Store 635); Cranberry Creek Partners, Inc. (landlord for Store 452); Huntington Mall Company (landlord for Store 489); Glimcher Properties Limited Partnership (landlord for Store 445); and Wyatt Development Co. (landlord for Store 444).

[9] CiCi Enterprises' cure claim shall be paid in accordance with the cure cost compromise.

**Class 3**        **Priority Unsecured Claims**

The Debtors' Bankruptcy Schedules included $34,175.13 in accrued vacation time for various of its employees.  Debtors included assumption of $6,918.12 of this amount in the sale and proposed sales of certain of their assets.  Assuming the proposed sales are approved, approximately $27,257.01 of these claimed amounts remain.  Within 20 days of the Effective Date, the Trustee shall object to any claim with which he disagrees.  The Court shall retain jurisdiction to adjudicate disputes over these claims.  The Trustee shall have discretion to either pay these claims out of the proceeds of ongoing operations or to continue the Debtors practice of incorporating assumption of these liabilities in the purchase price paid for the assets.

Class 3 is impaired.

**Class 4**        **Priority Tax Claimants**

The Debtors Bankruptcy Schedules included $665,984.50 (plus one unliquidated claim) in priority tax claims owed to their respective state taxing authorities for unpaid sales and margin taxes.  Debtors included assumption of $446,718.00 (and the unliquidated claim) of this amount in the sale and proposed sales of certain of their assets.  Assuming the proposed sales are approved, approximately $219,266.50 of these claimed amounts remain.  In addition, various taxing authorities[10] have filed priority claims for unpaid, pre-petition, ad valorem taxes.  The total amount of these claims is approximately $14,388.25.

Upon confirmation, the Trustee shall immediately move to set the claims deadline for government entities unless the Debtors have already done so.  Within 20 days after this deadline, the Trustee shall object to any claim with which he disagrees.  The Court shall retain jurisdiction to adjudicate disputes over these priority tax claims.  The Trustee shall have discretion to either

---

[10] These include Clear Creek ISD, Spring Branch ISD, Spring ISD, Humble ISD, Harris County M.U.D., Alief ISD, City of Rosenberg, Fort Bend County, Galveston County, Angelina County, Montgomery County, Harris   County, and Cypress Fairbanks ISD.

pay these claims out of the proceeds of ongoing operations or to continue the Debtors practice of incorporating assumption of these liabilities in the purchase price paid for the assets.

Class 4 is not a true class and is neither impaired nor unimpaired.

**Class 5**          **Secured Claim of The Frost National Bank**

Upon confirmation, the Bank's claim, right to monthly payments of interest, and lien(s) as described in its proof of claims and the Court's cash collateral order [Docket No. 215] survive and remain in full force and effect.   The Bank shall receive (subject only to the deductions for cure costs, post-confirmation administrative costs and general unsecured claims described herein) 100% of the net proceeds of any sale until its claim is paid in full including post-petition interest at the contract rate.   Its right to reject a sale for less than the full amount of its claim is limited as follows:  If a sale of the Debtors' assets in Texas and Maryland is proposed that will net $13 million or more (before payment owing to CiCi Enterprises is subtracted) with a closing date within 180 days of the date of confirmation, Frost loses its absolute right to reject the sale.  Frost will be deemed to have consented to a sale of the Texas and Maryland assets if that sale closes within 180 days of the date of confirmation and the sale nets $13 million or more (after taking into account all sales costs save and except for the amount owed CiCi Enterprises under the cure cost compromise).

If sale proceeds form the assets in Texas and Maryland exceed $13 million after payment of all sales costs and any outstanding administrative claims but before payment to CiCi Enterprises under the cure cost compromise order, 10% of the amount by which these sales proceeds exceed 13 million shall be paid pro-rata to the general unsecured claimants in Class 6 in addition to the $30,000.00 carve-out that will initially be distributed to the class.  Frost shall be paid the remaining 90% of the amount over $13 million.

Class 5 is impaired.

**Class 6**        **General Unsecured Claims**

Allowed Unsecured claims shall be paid a pro-rata portion of $30,000.00 of their allowed amount within 30 days from the claims objection deadline.  Allowed unsecured claimants shall receive an additional payment only to the extent a sale of the Debtor's assets as described in the Class 5 description generates revenue for that purpose.  The additional payment shall be made no later than the 30th day after closing.

Excluded from this class are the claims of Awesome Marketing, which were included in the Debtors' Bankruptcy Schedules, as these claims are subject to the cure cost compromise and are thus treated in Class 2.  Also excluded are claimants CiCi Enterprises and any landlord of an assumed lease.  All of these claimants are Class 2 claimants.

Class 6 is impaired.

**Class 7**        **Equity Claims**

No equity claimants will receive any distribution on account of equity ownership.  All equity interests will be cancelled upon confirmation of the Plan.

Class 7 is impaired.

**B.**        **Mechanics/Implementation of Plan**

**1.        Funding.**  The funding of the Plan will be derived from ongoing operations, the proceeds from the sales of Debtors' assets, and any recovery that may be had from the retained causes of action.

**2.        Claims Not Allowed Pending Objection.**  The Trustee shall object to any secured claims or general unsecured claims or commence an adversary proceeding to determine lien validity or priority on or before the 60th day following the Effective Date.  Claims not timely objected to or challenged by an adversary proceeding shall be deemed allowed.  Claims are not allowed pending resolution of the objection and/or adversary proceeding challenging them.

3.      **Sales.**  Debtors have sold the assets of Pizza Partners of South Carolina, L.P., and

have proposed sales of the assets of Pizza Partners of Cincinnati, L.P., Pizza Partners of Ohio,

Ltd., Pizza Partners of West Virginia, Limited Partnership, and TEG-Pizza Partners of Indiana,

L.P.  The Trustee shall continue the ongoing sales efforts with respect to these entities, and shall

also work to sell the remainder of Debtors' assets.  The proceeds of these sales shall be applied

as set forth in the Plan.

4.      **Plan Trustee.**  Milo Segner shall serve as Trustee.  Upon appointment, all causes

of action under 11 U.S.C. §§ 544, 547, or 548 that are property of the estate will be assigned to

the Trustee for the benefit of the holders of the allowed claims in Classes 1 through 6.[11]  The

Trustee shall also be empowered and authorized to represent the interests of these holders of

allowed claims in the filing of claim objections, whether then pending or later filed, as well as

representing those holders of allowed claims in any litigation in state court, federal court, or the

bankruptcy court in which any party seeks adjudication of a counterclaim against the estate or

the determination of validity, priority, or amount of a lien asserted against property of the estate.

The Trustee shall have authority to continue the Debtors' operations and to conduct a sale

of the assets when he deems the timing appropriate.  Distribution of the proceeds of ongoing

operations and from the eventual liquidation shall be in accordance with the Plan.

The Trustee shall be reimbursed for reasonable expenses incurred in carrying out the

provisions of the Plan and shall receive compensation as though a Chapter 11 trustee under the

provisions of 11 U.S.C. § 326.  He shall make application to the Court for approval as if he were

a Chapter 11 trustee, with the same procedures for objections and allowance applying.  As

previously mentioned, the Trustee shall hire Apex and also retain the services of Mr. Eiserman

---

[11] As a creditor plan proponent, Frost is not aware of all the potential lawsuits or causes of action that may be
property of the estate.  The Plan contemplates vesting these as of yet unknown claims in the Trustee for the benefit
of the Holders of the Allowed Claims in Classes 1 through 6.

(either as an employee or an independent contractor as the Trustee shall deem appropriate)  to carry out the provisions of the Plan.  The Trustee may hire such other professionals as are required in his sole discretion.

5.    **Litigation.**  To the plan proponent's knowledge, the Debtors are a party to only the declaratory judgment action they filed against McMullin Investments, L.P. in this Court [Adversary Case 10-03022] (the "McMullin Lawsuit"].  All of Debtors' right, title, and interest in the McMullin lawsuit and the proceeds therefrom shall vest in the Trustee upon confirmation of the Plan and shall remain subject to Frost's security interest.

C.    <u>**Feasibility of the Plan**</u>

The Debtors have already established an $11 million floor for the assets situated in Texas and Maryland.  The Plan is feasible even at this level.  However, under the Plan, Apex, an industry expert experienced in managing underperforming restaurant chains, will work under the direction of the Trustee to finalize the revised operating budget of the Debtors.  The objective will be to increase profitability of the Debtors, which is likely to significantly increase interest in and the value of the Debtors to potential buyers.  It is anticipated that increased profitability, coupled with increasing valuation multiples, will result in significantly increased sales proceeds which can be distributed to creditors.  With increased sales proceeds, the Plan obviously remains feasible, and it will provide increased benefit to all creditors.

D.    <u>**Claims Allowance Procedure**</u>

If a creditor or interest is scheduled in the Schedule of Liabilities filed by the Debtors, that schedule constitutes prima facie evidence of the validity and amount of the claims of creditors and interests.  It is not necessary for a creditor or interest to file a proof of claim if there is not a disagreement as to the amount owed.  If you disagree with the amount scheduled or you are a creditor whose claim or interest is not scheduled or scheduled as unknown, disputed,

contingent, or unliquidated, you **MUST** file a proof of claim or interest by the bar date.  Any creditor who fails to do so shall not be treated as a creditor with respect to such claim for purposes of voting and distribution.

**THE BAR DATE FOR FILING PROOFS OF CLAIM IN THIS CASE WAS SEPTEMBER 9, 2009 FOR NON-GOVERNMENTAL CLAIMS ASSERTED AGAINST WINMAR PIZZA, LP AND OCTOBER 27, 2009 FOR NON-GOVERNMENTAL CLAIMS ASSERTED AGAINST ANY OF THE REMAINING DEBTORS.  THE BAR DATE FOR A GOVERNMENT ENTITY TO FILE A CLAIM AGAINST ANY OF THE DEBTORS SHALL BE SET BY THE TRUSTEE IMMEDIATELY AFTER CONFIRMATION.  THE BAR DATE FOR FILING LEASE REJECTION CLAIMS IS THE 11th DAY FOLLOWING THE ENTRY OF THE ORDER CONFIRMING THE PLAN.  Any late filed claims will be deemed disallowed without further order of the Court upon confirmation of the Plan pursuant to Bankruptcy Rule 3003.  Pursuant to Bankruptcy Rule 3003, any creditor who was scheduled as contingent, unliquidated, or disputed who did not file a claim will be treated as not having a claim for voting or Plan distribution.**

Pursuant to § 502 of the Bankruptcy Code, your claim will be allowed against a Chapter 11 estate in either:  (1) the scheduled amount; or (2) the amount shown on your proof of claim unless the Debtor or a party in interest objects to your claim.  The controversy will be set for a hearing and the allowed amount of your claim will be determined by the Bankruptcy Court.  Generally, unsecured claims will not be allowed to accrue interest after the Filing Date, while secured claims may be allowed post-petition interest and other charges under Section 506 of the Bankruptcy Code.  In order to be fully apprised of your claim rights, you should consult an attorney knowledgeable in bankruptcy matters.

You, the Claimant, have the responsibility for determining how your claim has been scheduled in the case. To avoid any possibility of error, you should check the Court records to determine how your claim has been scheduled. In order to protect your interests, consult YOUR ATTORNEY on any questions you may have concerning the filing or allowance of your claim.

### E.    Retention of Jurisdiction

Once a Plan of Reorganization is confirmed by the Court, the Court's role changes. Until the case is closed, the Court shall have jurisdiction over the following matters. This list is meant to be descriptive and is not intended to be an exhaustive recitation of the Court's authority. The Court shall retain jurisdiction:

1)      To insure that the purpose and intent of this Plan are carried out;

2)      To consider any modification of this Plan under § 1127 of the Code;

3)      To hear and determine all claims, controversies, suits and disputes against the Debtors or the estate;

4)      To hear and determine all controversies, suits and disputes that may arise in connection with the interpretation or enforcement of this Plan;

5)      To hear and determine all requests for compensation and/or reimbursement of expenses which may be made after the Effective Date of the Plan;

6)      To hear and determine all objections to claims, controversies, suits and disputes that may be pending at or initiated after the Effective Date of the Plan, except as provided in the confirmation order;

7)      To consider and act on the compromise and settlement of any claim against or cause of action on behalf of the Trustee or the estate;

8)      To enforce and interpret by injunction or otherwise the terms and conditions of the Plan;

9)      To enter an order concluding and terminating this case;

10)      To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or confirmation order which may be necessary or helpful to carry out the purposes and intent of the Plan;

11)      To determine all questions and disputes regarding titles to the assets of the Debtors or the estate;

12)      To classify the claims of any creditor and to re-examine claims which have been allowed for purposes of voting, and to determine objections which may be filed to creditors' claims (the failure by the Debtor to object to, or examine any claim for the purposes of voting shall not be deemed a waiver of the Trustee's right to object to, or re-examine the claim in whole or part);

13)      To consider and act on such other matters consistent with this Plan as may be provided in the confirmation order;

14)      To consider the rejection of executory contracts that are not discovered prior to confirmation and allow claims for damages with respect to the rejection of any such executory contracts within such further time as this Court may direct.

15)      To hear and determine all issue related to adequate assurance in conjunction with the assignment of executory contracts.

Consummation of the Plan will occur once the Debtors' assets are liquidated and the proceeds distributed in accordance with the Plan, unless there is an adversary or other matter pending at that time, in which case no Application for Final Decree will be made until that matter is resolved.

## V.   ALTERNATIVES TO FROST'S PLAN

The alternative to this Plan is either continuation of the status quo or a Chapter 7 liquidation.   In either event, the result is the same—liquidation of the Debtors' assets—but without the increased value that can be realized by the appointment of the Trustee and the cost-cutting, revenue-increasing expertise offered by Apex.   Also, under either of these alternatives, the prospect of any claimant lower than Frost receiving any payment is virtually zero.

## VI.   RISKS TO CREDITORS UNDER FROST'S PLAN

The financial forecast set forth in this statement reflects Frost's judgment based on present circumstances and the most likely set of conditions and courses of action.   The assumptions disclosed herein are those that Frost believes are significant to the financial forecast and are key factors upon which the Debtors' operating results depend.   Some assumptions inevitably will not materialize and unanticipated events and circumstances may occur subsequent to the date of this statement.   Therefore, actual results may vary from the financial forecast. However, Frost does not believe the variations will be material.

The forecasts based on Debtors' sales are subject to the risks generally incident to sales, including:   adverse changes in national economic conditions; adverse changes in local market conditions due to changes in general or local economic conditions; and other factors which are beyond the Debtors' and/or Trustee's control.

## VII.   CREDITORS' REMEDIES UPON DEFAULT

The treatment provided to Classes of Claims, upon confirmation of the Plan will constitute a judicial determination of the rights of each claimant.   In the event that a creditor does not receive a payment required under the Plan, a creditor can send notice of said default to the Trustee, requesting a response within 20 business days of receipt.   If the Trustee fail to respond satisfactorily within 20 days, that creditor may pursue any or all remedies available under state or

federal law.  Failure to commence an action in a Court of competent jurisdiction by an affected

creditor within the applicable statute of limitations after the Trustee's failure to make payment

required by the terms of this Plan, without regard to whether there has been given notice of

failure to pay and without regard to whether default has occurred, shall cause the claim to be

barred by limitations and waiver.

## VIII.   TAX CONSEQUENCES

An analysis of federal income tax consequences of the Plan to Creditors and the Debtors

requires a review of the Internal Revenue Code, the Treasury Regulations promulgated

thereunder, judicial authority, and current administrative rulings and practice.  The Plan and its

related tax consequences are complex.  The Debtor has not requested a ruling from the Internal

Revenue Service, nor has he obtained an opinion of counsel.  This summary is provided for

informational purposes only, and we assume no responsibility for the effect consummation of the

Plan will have on any given creditor.  Therefore, all creditors should consult with their own tax

advisors concerning the particular effect to them of the federal, state, local and foreign tax

consequences of the Plan.

### A.    <u>Tax Consequences to Debtors</u>

Generally speaking, under the Internal Revenue Code of 1986 (the "Tax Code"), the

filing of the Chapter 11 bankruptcy petition by a Debtor results in the treatment of the estate as a

separate taxable entity.  The estate must file tax returns and pay taxes on its taxable income

generated during the period of administration.  Any tax liability payable by the estate would be

an administrative claim.  Accordingly, if the estate were to have a significant income tax

liability, the funds available for distribution to unsecured creditors would be reduced.

The estate succeeds to the Debtors' tax attributes existing as of the first day of the taxable

year in which the bankruptcy petition is filed.  Accordingly, under the general rule, the estate

would succeed to the Debtors' tax attributes existing as of January 1, 2009. These tax attributes could include any of the following: Debtors' net operating loss carryovers, investment tax credit carryovers, and tax bases in assets.

Under Tax Code § 1398(d)(2), a debtor can make an election to terminate his taxable year as of the day prior to the date of the filing. Until Debtors' tax returns for the pre-bankruptcy period are filed, the magnitude of the tax attributes available to the estate cannot be determined with certainty as of the time of this Disclosure Statement.

As of the date of this Disclosure Statement, no significant taxable events are believed to have occurred since the filing of this case in terms of disposition of estate property. The Tax Code [§ 1398(h)(8)] allows an estate to deduct administrative expenses during a bankruptcy case. Under § 1398(f)(2) of the Tax Code, transfers from a bankruptcy estate to a debtor upon the termination of the estate will not be treated as a disposition giving rise to recognition of gain or loss. In such event, a debtor succeeds to the tax attributes of the estate.

At least two courts have found that debtors continue to have liability for any taxes resulting from dispositions of assets under plans, although there can be no assurance that such rulings will necessarily be followed by the Court under the facts of this case. The Plan requires Debtors' share of these taxes to be paid prior to any distribution to creditors upon the sale of a property. Taxes are potentially payable from dispositions of property by foreclosure, just as in the event of a voluntary sale. The amount of tax payable for sales of property encumbered by recourse debt would be measured by the fair market value of the property at the time of the sale, less the taxpayer's basis in the property. Further, disposition of property giving rise to losses and disposition of property giving rise to gains could occur in different tax years. Therefore, the Plan may create some risk of a tax liability to the bankruptcy estate (Debtor).

THE PRECEDING INFORMATION IS BASED ON THE 1986 TAX CODE AND THE

DISCUSSION HEREIN MAY CHANGE BASED ON AMENDMENTS TO THAT TAX CODE. INDIVIDUAL CREDITORS SHOULD CONSULT THEIR OWN TAX ADVISERS REGARDING THE EFFECT OF THE PLAN. TO PROTECT BOTH THE DEBTORS AND THE ESTATE FROM TAX CONSEQUENCES, THE DEBTORS OR ANY PARTY IN INTEREST MAY, WITH COURT APPROVAL, RETAIN ACCOUNTANTS TO EVALUATE TAX ISSUES.

B.    **Federal Income Tax Consequences to Creditors**

The federal income tax consequences of the implementation of the Plan to a creditor will depend in part on whether, for federal income tax purposes, the obligation from which a creditor's claim arose constitutes a "security." The determination as to whether an obligation from which a creditor's claim arose constitutes a "security" for federal income tax purposes is complex. It depends on the facts and circumstances surrounding the origin and nature of the obligation. Generally, corporate debt obligations evidenced by written instruments with maturities, when issued, of five years or less, or arising out of the extension of trade credit, do not constitute "securities", whereas corporate debt obligations evidenced by written instruments with original maturities of ten years of more constitute "securities," Frost expresses no views with respect to whether the obligation from which a particular creditor's claim arose constitutes a "security" for federal income tax purposes. Creditors are urged to consult their own tax advisors in this regard.

Exchanges by creditors whose claims arise from obligations that do not constitute "securities", or whose claims are for wages or services, will be fully taxable exchanges for federal income tax purposes. Such creditors who receive solely cash in discharge of their claims will recognize gain or loss, as the case may be, equal to the difference between (i) the amount realized by the creditor in respect of its claim (other than any claim for accrued interest) and (ii)

the creditor's tax basis in its claim (other than any claim for accrued interest).  For federal income tax purposes, the "amount realized" by a creditor who receives solely cash in discharge of its claim will be the amount of cash received by such creditor.

Where gain or loss is recognized by a creditor, the character of such gain or loss as a long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the creditor, whether the obligation from which a claim arose has been held for more than six months, and whether and to what extent the creditor has previously claimed a bad debt deduction.

To the extent any amount received (whether cash or other property) by a creditor is received in discharge of interest accrued on its claim during its holding period, such amount will be taxable to the creditor as interest income (if not previously included in the creditor's gross income).  Conversely, a creditor will recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent any interest accrued on its claim was previously included in the creditor's gross income and is not paid in full.

## IX.    EXECUTORY CONTRACTS AND LEASES

The franchise relationship with CiCi Enterprises and the lease relationships with various landlords are described elsewhere in this Disclosure Statement.

## X.    CONCLUSION

Frost believes that this Disclosure Statement provides adequate information to the creditors and that the Court should so find.

Dated:  April 5, 2010.

Respectfully submitted,

_____/s/ Clay M. Taylor_____ _____

J. Stephen Ravel
Texas Bar I.D. 16584975
Clay M. Taylor
Texas Bar I.D. 24033261
C. Josh Osborne
Texas Bar I.D. 24065856
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:      817/332-2500
Telecopy:       817/878-9280

COUNSEL FOR THE FROST NATIONAL BANK

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served on April 5, 2010, on the persons/entities identified as having received service via ECF notification and on the attached service list via first class mail, if the party did not receive via ECF notification.

_____/s/ C. Josh Osborne_____ _

C. Josh Osborne