J. Stephen Ravel
Texas Bar I.D. 16584975
Clay M. Taylor
Texas Bar I.D. 24033261
C. Josh Osborne
Texas Bar I.D. 24065856
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:      817/332-2500
Telecopy:       817/878-9280

COUNSEL FOR THE FROST NATIONAL BANK

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| WINMAR PIZZA, L.P., *et al.* | § | Case No. 09-33027-BJH-11 |
| | § | |
| Debtors-in-Possession | § | (Jointly Administered) |

**PLAN OF REORGANIZATION
FILED BY THE FROST NATIONAL BANK
<u>ON APRIL 5, 2010</u>**

The Frost National Bank ("Frost"), party-in-interest and senior secured creditor of Debtors Winmar Pizza, L.P., Pizza Foods of Texas, L.P., TEG-Pizza Partners of Texas, L.P., TEG Pizza Partners Holdings, L.P., Pizza Partners of Maryland, L.P., Pizza Partners of Cincinnati, L.P., Pizza Partners of Ohio, Ltd., Pizza Partners of West Virginia, Limited Partnership, TEG-Pizza Partners of Indiana, L.P., Pizza Partners of Florida, Limited Partnership, and Pizza Partners of South Carolina, L.P. (collectively, "Debtors"), hereby proposes this Plan of Reorganization pursuant to Section 1121, Chapter 11 of Title 11 of the United States Code.

1125822_2

**TABLE OF CONTENTS**

I. DEFINITIONS, CONSTRUCTION, AND INTERPRETATION ................................. 3

II. PLAN DYANAMICS ........................................................................................ 7

III. CLASSIFICATION OF CLAIMS AND INTERESTS ........................................... 8

IV. IDENTIFICATION OF UNIMPAIRED AND IMPAIRED CLASSES.................. 9

V. TREATMENT OF CLAIMS AND INTERESTS..................................................... 9

VI. MEANS FOR EXECUTION OF THE PLAN ....................................................... 13

VII. CREDITORS' REMEDIES UPON DEFAULT ..................................................... 14

VIII. DISPUTED CLAIMS AND OBJECTIONS TO CLAIMS ................................... 15

IX. DISTRIBUTION UNDER THE PLAN .................................................................. 15

X. RETENTION OF JURISDICTION ........................................................................ 16

XI. MODIFICATION OF PLAN .................................................................................. 18

XII. PRIOR ORDERS..................................................................................................... 18

# ARTICLE I

## DEFINITIONS, CONSTRUCTION, AND INTERPRETATION

Unless the context otherwise requires, capitalized terms as used herein shall have the respective meanings set forth below.  A capitalized term used herein that is not defined in this Article or otherwise defined in the Plan shall have the meaning ascribed to that term, if any, in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan, provided that in the event of any conflict between the Plan and the Disclosure Statement, the Plan shall govern.  In the event a conflict between the Plan and any document implementing the Plan arises, the document shall govern.  In the event a conflict between the Plan and the Confirmation Order arises, the Confirmation Order shall govern. Whenever the context requires, words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender and vice versa.

**1.01.** *"Administrative Claim"* means a Claim for payment of an administrative expense of a kind within the scope of section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) claims asserted under section 503(b)(9) of the Bankruptcy Code, (b) actual, necessary costs and expenses of preserving the Debtors' Estates and, as applicable, operating their businesses, including wages, salaries, or commissions for services rendered, on or after the Petition Date (including any Claim incurred in the ordinary course of the Debtors' businesses which may be paid in the ordinary course of the Debtors' businesses without order of the Bankruptcy Court), (c) Fee Claims and all other claims for compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, and (d) all fees and charges assessed against the Estates under the Bankruptcy Code or under Chapter 123 of Title 28 of the United States Code.

**1.02.** *"Allowed"* with respect to a Claim other than an Administrative Claim, or any portion thereof, means such a Claim (a) that has been allowed by a Final Order, (b) that was listed in the Schedules or any amendment thereof as neither disputed, contingent nor unliquidated and for which no timely objection was filed, (c) for which a proof of Claim in a liquidated amount has been timely filed pursuant to the Bankruptcy Code or any Final Order of the Bankruptcy Court and as to which either (i) no objection to its allowance has been filed on or before the Objection Deadline or within any other period fixed by the Bankruptcy Code or the Bankruptcy Court or (ii) any objection to its allowance has been settled, waived through payment, withdrawn, or denied by a Final Order of the Bankruptcy Court, or (d) that is expressly allowed in a liquidated amount in the Plan; with respect to an Administrative Claim, means an Administrative Claim for which a timely request for payment has been made that has been allowed by a Final Order of the Bankruptcy Court; and with respect to an Interest, means any Interest that appears, as of the Voting Deadline, in the equity register or other similar records maintained by or on behalf of the Debtors.

1.03.    *"Apex Restaurant Group"* means Apex Restaurant Group, LP.

1.04.    *"Assumed Leases"* means those unexpired leases assumed by Order of this Court [Docket Nos. 265 & 331] and any additional leases that are assumed by the Debtors prior to the appointment of the Trustee or by the Trustee after appointment.

1.05.    *"Bankruptcy Code"* means the Bankruptcy Reform Act of 1978, as amended, and codified at Title 11 of the United States Code.

1.06.    *"Court"* means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or such other court having jurisdiction over the Bankruptcy Cases.

1.07.    *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code.

1.08.    *"Causes of Action"* means any and all causes of action, claims, rights of action, suit or proceedings, whether in law or equity, whether known or unknown, which have been or could be asserted by the Debtors, the Estates, or the Trustee (in his capacity as the Trustee of the Estates or on behalf of the Debtor or the Estate), as of the Effective Date, including without limitation, all Avoidance Actions.

1.09.    *"CiCi Enterprises"* means CiCi Enterprises, L.P.

1.10.    *"Claim"* shall have the meaning provided in section 101(5) of the Bankruptcy Code.

1.11.    *"Collateral"* means an asset(s) subject to a valid, enforceable, and non-avoidable Lien securing the payment of a Claim.

1.12.    *"Confirmation"* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.13.    *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to Bankruptcy Code section 1128.

1.14.    **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.15.    *"Contested"* means, with respect to a Claim or Interest, a Claim against or Interest in a Debtor, or any portion thereof, that has not been Allowed pursuant to the Plan or a Final Order and (a) that is listed in the Schedules as disputed, contingent, or unliquidated; (b) that is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a proof of Claim or Interest has been timely filed or deemed timely filed with the Bankruptcy Court, to the extent the amount asserted in the proof of Claim or Interest exceeds the scheduled amount; (c) as to which any party in interest has timely filed an objection or request for

estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules or any order of the Bankruptcy Court, or which is otherwise disputed by any of the Debtors or the Trustee in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or resolved or determined by a Final Order; or (d) that is the subject of a pending action in a forum other than the Bankruptcy Court unless such Claim or Interest has been determined by Final Order in such other forum and Allowed by Final Order of the Bankruptcy Court. To the extent an objection related to the allowance of only a part of a Claim or Interest has been timely filed, such Claim or Interest shall be a Contested Claim only to the extent of the objection.

1.16.    *"Creditor"* means a holder of a Claim against any of the Debtors.

1.17.    *"Distribution"* means the property required by the Plan to be distributed to the Holders of Allowed Claims.

1.18.    *"Effective Date"* means the first business day on which no stay of the Confirmation Order is in effect that is after ten (10) days (as calculated in accordance with Bankruptcy Rule 9006(a)) following Confirmation.

1.19.    *"Equity Interest"* means any existing equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor.

1.20.    *"Estate"* means an applicable Debtors' estate in these cases created pursuant to section 541 of the Bankruptcy Code.

1.21.    *"Executory Contract"* means any pre-petition executory contract or unexpired lease governed by section 365 of the Bankruptcy Code.

1.22.    *"Fee Application"* means an application for the allowance of a Fee Claim.

1.23.    *"Fee Claim"* means a Claim by a Professional or any other party-in-interest pursuant to sections 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code or otherwise relating to services performed after the Petition Date and prior to and including the Effective Date.

1.24.    *"Final Order"* means an order which has not been stayed or otherwise superseded on the 11th day after its issuance.

1.25.    *"Franchise Agreements"* means those franchise agreements between the Debtors and CiCi Enterprises that are assumed by the Debtors or by the Trustee.

1.26.    *"General Unsecured Claim"* means an Unsecured Claim.

1.27.    *"Holder"* means a Person who is the beneficial owner of a Claim or Interest. For purposes of a Distribution, a Person must be a Holder as of the Distribution Record Date. For purposes of voting to accept or reject the Plan, a Person must be a Holder as of the voting record date.

1.28. *"Landlords"* means the lessor parties to the Assumed Leases.

1.29. *"McMullin Lawsuit"* means the declaratory judgment action the Debtors filed against McMullin Investments, L.P. in this Court [Adversary Case 10-03022].

1.30. *"Outlier Entity Assets"* means the assets of Pizza Partners of Cincinnati, L.P., Pizza Partners of Ohio, Ltd., Pizza Partners of West Virginia, Limited Partnership, TEG-Pizza Partners of Indiana, L.P., Pizza Partners of Florida, Limited Partnership, and Pizza Partners of South Carolina, L.P.

1.31. *"Plan"* means this Plan of Reorganization either in its present form or as it may hereafter be altered, amended or modified from time to time.

1.32. *"Priority Tax Claim"* means any Claim against the Debtors that, if Allowed would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

1.33. *"Professional"* means (a) any professional employed in the Bankruptcy Cases pursuant to Bankruptcy Code sections 327, 328 or 1103 or otherwise and (b) any professional or other Person seeking compensation or reimbursement of costs and expenses in connection with the Bankruptcy Cases pursuant to Bankruptcy Code sections 503(b)(4) or 1129(a)(4).

1.34. *"Pro Rata Share"* means, at any time, the proportion that the face amount of a Claim or an Interest in a particular Class bears to the aggregate face amount of all Claims or Interests in that Class.

1.35. *"Retained Cause of Action"* means all causes of actions under sections 544, 547, or 548 of the Bankruptcy Code that are property of the estate.

1.36. *"Schedules"* means the schedules of assets and liabilities and the statement of financial affairs filed by each of the Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements have been or may be supplemented or amended.

1.37. *"Secured Claim"* means a Claim secured by a Lien on or security interest in property of the Debtors, which Lien or security interest is valid, perfected and enforceable under applicable law, is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law and is duly established in the Bankruptcy Case, but only to the extent of the value of the Collateral that secures payment of such Claim in accordance with Bankruptcy Code section 506 and taking into account any other Secured Claims with respect to such Collateral not inferior in priority to such Secured Claim or, in the event that such Claim is subject to setoff under Bankruptcy Code section 553, to the extent of such setoff. Secured Claims shall include Claims secured by Liens or security interests junior in priority to existing security interests or Liens, whether by operation of law, contract, or otherwise, but solely to the extent of the value, as of the Effective Date or such other date established by the Bankruptcy Court, of such Claim Holder's interest in the Estate's interest in such property after giving effect to all Liens or security interests senior in priority.

**1.38.** *"Texas and Maryland Assets"* means the assets of Winmar Pizza, L.P., Pizza Foods of Texas, L.P., TEG-Pizza Partners of Texas, L.P., TEG Pizza Partners Holdings, L.P., and Pizza Partners of Maryland, L.P.

**1.39.** *"Trustee"* means Milo Segner, in his capacity as the duly-appointed Chapter 11 Trustee for the Debtors' Estates.

**1.40.** *"Unclaimed Property"* means any Distribution under the Plan made to a Holder of an Allowed Claim that (a) is returned as undeliverable and no appropriate forwarding address is received within the later of (i) 90 days after the Effective Date and (ii) 90 days after such attempted Distribution is made to such Holder; or (b) in the case of a Distribution made in the form of a check, is not negotiated within 90 days and no request for re-issuance is made.

**1.41.** *"Unsecured Claim"* means a Claim that is not a Secured Claim, an Administrative Claim, or a Priority Tax Claim, and shall include any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Bankruptcy Code section 365, save and except for the fully compromised claims of CiCi Enterprises.

## ARTICLE II

## PLAN DYNAMICS

**2.01. Appointment of Trustee.** Milo Segner, a qualifying Chapter 11 Trustee, shall serve as the Plan Trustee. The Trustee shall have all powers, obligations, and authority permitted under all applicable provisions of the Bankruptcy Code. The Trustee shall succeed to all rights (including but not limited to contractual and statutory rights) of the Debtors in executory contracts and unexpired leases. Any adequate assurance issues caused by such succession shall have been resolved prior to Confirmation.

**2.02. Interim Management.** The Trustee shall contract with Apex Restaurant Group to provide management for the Debtors' ongoing operations until such time as the Debtors' assets may be liquidated in accordance with this plan.

**2.03. Key Employees.** Tony Eiserman shall be designated a key employee and shall serve under the direction of Apex Restaurant Group. He shall serve as "operating principal" (as that term is defined in the Debtors' Franchise Agreements with CiCi Enterprises) until agreed otherwise by both CiCi Enterprises and the Trustee or until he is removed by this Court for good cause shown. Any successor to Mr. Eiserman chosen by the Trustee, or appointed after an Order of this Court removing Mr. Eiserman, shall be qualified under the Franchise Agreements' terms. Through the time the Trustee assumes duty and thereafter, Mr. Eiserman shall coordinate the Debtors' full and complete cooperation with a transition to Apex Restaurant Group as manager of the Debtors; however, Mr. Eiserman shall continue to be the operating principal.

**2.04. Ongoing Operations.** The Trustee, with the assistance of Apex Restaurant Group and Tony Eiserman, shall continue the Debtors' ongoing operations, but with a concentration on implementing a series of cost control measures, local store marketing programs, and operations enhancements to increase profitability. Day to day business will be conducted in

the ordinary course and in compliance with the Franchise Agreements and Assumed Leases. Taxes shall be paid (or reserved for) in the ordinary course of business, and interest payments to Frost shall continue to be made at the contract rate.

**2.05.    Sale of Outlier Stores.**  If sales of the Outlier Entity Assets have not yet closed at the time of Confirmation, the Trustee shall attempt to effectuate sales of these assets at the highest and best price obtainable.  When the Trustee decides that a sale of these assets is appropriate, he shall notify the parties to executory contracts and unexpired leases to be assigned and file notice with the Court.  Proceeds shall be distributed in accord with Article V.

**2.06.    Sale of Texas and Maryland Assets.**  The Trustee shall market the Texas and Maryland Assets as he deems appropriate.  When the Trustee decides that a sale of these assets is appropriate, he shall notify the parties to executory contracts and unexpired leases to be assigned and file notice with the Court.  Proceeds from the sale of these assets shall be distributed in accord with Article V.

**2.07.    Objections to Sales.**  Parties to the Franchise Agreements and Assumed Leases may only object to proposed sales if they do not receive adequate assurance as mandated by Section 365 of the Bankruptcy Code.

**2.08.    Credit Bid Rights.**  Frost retains its rights to credit bid at the sales.  However, For the first 180 days after confirmation, Frost may only reject any proposed sale of the Texas and Maryland Assets if the net proceeds of such an offer (before reduction for the amount owed CiCi Enterprises under the cure cost compromise) is less than a combined $13 million.  If a sale of these assets is proposed that will net $13 million or more (before payment owing to CiCi Enterprises is subtracted) with a closing date within 180 days of the date of confirmation, Frost loses its absolute right to reject the sale.  Frost will be deemed to have consented to a sale of the Texas and Maryland assets if that sale closes within 180 days of the date of confirmation and the sale nets $13 million or more (after taking into account all sales costs save and except for the amount owed CiCi Enterprises under the cure cost compromise).

**2.09.    Litigation.**  All of Debtors' right, title, and interest in the McMullin Lawsuit and the proceeds therefrom shall vest in the Trustee and shall remain subject to Frost's security interest.  The Trustee shall pursue this cause of action for the benefit of the estate.  Proceeds shall be distributed in accord with Article V.

**2.10.    Winding Up.**  After all of the Debtors' assets are liquidated and all litigation concluded in accordance with this Plan, the Trustee shall take all necessary steps to wind up the Debtors' ongoing operations and dissolve these entities.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

**3.01.    Classification.**  All Claims (other than Administrative Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims) and Interests are placed in Classes under the Plan.  A Claim is classified within a particular Class only to the extent that the Claim qualifies

under the description of that Class. An Interest is classified within a particular Class only to the extent that the Interest qualifies under the description under that Class. Administrative Claims, Fee Claims, and U.S. Trustee Fees, as well as Priority Tax Claims are respectively placed in Class 1 and Class 4 only for convenience; these are not true classes. Their treatment is prescribed by the Bankruptcy Code, and the Holders of such Claims are not entitled to vote on the Plan.

**3.02. Classified Claims and Interests.** The Claims against and Equity Interests in the Debtors are classified as follows:

| | |
|---|---|
| Class 1: | Administrative Claims |
| Class 2: | Executory Contract Administrative Claims |
| Class 3: | Priority Unsecured Claims |
| Class 4: | Priority Tax Claimants |
| Class 5: | Secured Claim of The Frost National Bank |
| Class 6: | General Unsecured Claims |
| Class 7: | Equity Interests |

## ARTICLE IV

## IDENTIFICATION OF UNIMPAIRED AND IMPAIRED CLASSES

**4.01. Unimpaired Classes.** There are no unimpaired classes of claims against the Debtors.

**4.02. Impaired Classes.** Claims in Classes 2, 3, 5, and 6 are impaired under the Plan and the Holders of those Claims are entitled to vote to accept or reject the Plan.

**4.03. Impaired Interests.** The Holders of Equity Interests in the Debtors in Class 7 will not receive or retain any property on account of such Interests, and such Holders are deemed to have Rejected the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

**4.04. Controversy Concerning Impairment.** In the event of a controversy as to whether any Claim or Class of Claims is impaired under the Plan, the Bankruptcy Court will, after notice and a hearing, determine the controversy.

## ARTICLE V

## TREATMENT OF CLAIMS AND INTERESTS

**5.01. Class 1. Administrative Claims**

**(a) Description and Treatment.** Administrative Claims for Professional Fees which occurred prior to Confirmation, and for which application is made, shall be paid in full or

as the same are allowed, approved, and ordered paid by the Court.[1] The Trustee's attorneys' fees incurred post-Confirmation may be paid by the Debtors in the ordinary course of business without prior approval by the Court. In addition, fees and expenses incurred by the Trustee unrelated to the Plan and in the ordinary course of business will be paid from the proceeds of ongoing operations without prior approval by the Court.

The Trustee shall pay to the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) on the Effective Date of the Plan and simultaneously provide to the United States Trustee an appropriate affidavit indicating cash disbursements for the relevant period. Quarterly payments will be paid through the quarter the Plan is dismissed, converted, or the case closed, or sooner as provided by law.

This class of claimants also includes claims which have arisen between the Petition Date and the Confirmation Date, including post-petition tax claims. To date, seven taxing authorities have filed such claims in an amount totaling approximately $15,832.24.[2] To the extent these remain unpaid, within 20 days of the Effective Date, the Trustee shall either pay these claims or object to any claim with which he disagrees. Objected to claims shall be paid as allowed, approved, and ordered paid by the Court. Future tax liabilities shall be paid in the ordinary course of business without the need for prior approval by the Court.

**(b) Impairment and Voting.** Class 1 is not a true Class and thus is neither impaired nor unimpaired. The Claimants are not entitled to vote on the Plan.

**5.02. Class 2. Executory Contract Administrative Claims**

**(a) Description and Treatment.** CiCi Enterprises, as franchisor of assumed Franchise Agreements, and the Landlords[3], as parties to the Assumed Leases, are entitled to cure

---

[1] Fee applications will be filed with the Trustee, and he shall distribute these filed applications to attorneys for Frost and CiCi Enterprises. If no agreement can be reached by all parties as to the reasonableness and necessity of the requested fees, each party shall file a brief (of no more than 10 pages) either in support or opposition to the fee application and set the matter for hearing and decision by this Court.

[2] These filing taxing authorities include Montgomery County, Harris County, Galveston County, Fort Bend County, Polk County, Angelina County, and Cypress-Fairbanks Independent School District.

[3] These entities include: Fuqua Business Center, LP (landlord for Store 80); Petereit Investments, Inc. (landlord for Store 45); Lake Jackson Brazos Square LTD (landlord for Store 91); Reprise, Ltd. (landlord for Store 118); JK Woodbine, LP (landlord for Store 126); Weingarten Realty Investor (landlord for Stores 142 & 616); MB Houston Antoine Limited Partnership (landlord for Store 441); Bohica Holdings, Ltd. (landlord for Store 449); Riverway Commercial Development, LLC (landlord for Store 548); Hunting Bayou, LP (landlord for Store 605); Chouong To (landlord for Store 678); Festival Properties, Inc. (landlord for Store 57); VIF Kingwood S/C Partners LP (landlord for Store 107); Fairway 35, LLC (landlord for Store 132); Harold A. Clark & Company (landlord for Store 164); Porter Retail Center, Ltd. (landlord for Store 389); Jack G. Jackson (landlord for Store 464); Weingarten/Lufkin Inc. (landlord for Store 59); CFP I LTD (landlord for Store 43); EQYInvest Owner II, Ltd., LLP (landlord for Store 46); Galileo Apollo I TX, LP (landlord for Store 62); Gesner Place – MetroNational Corporation (landlord for Store 86); Houston Village Green Plaza (landlord for Store 87); Kimco Realty Corporation (landlord for Store 121); Conroe Crossroads Center, LP (landlord for Store 123); Houston Pacific Trust (landlord for Store 127); Northline Commons (landlord for Store 133); Unified Commercial Properties LLC (landlord for Store 193); Texas Grouper, Inc.

cost payments due to the Debtors' assumption of franchise agreements and unexpired leases. By Court order, the Debtors should have already cured all of the Assumed Leases. [Docket Nos. 265 & 331]. To the extent this has not occurred, within 20 days of the Effective Date, the Trustee shall either make cure payments or object to any cure claim with which he disagrees. Objected to claims shall be paid as allowed, approved, and ordered paid by the Court. Also by Court Order, CiCi Enterprises' cure costs are fully liquidated and scheduled to be paid out of liquidation proceeds by agreement [Docket No. 262]. This cure cost compromise remains in full force and effect. The Trustee shall pay CiCi Enterprises' cure costs as detailed therein. Until the assets are sold, the Trustee shall keep the Franchise Agreements and Assumed Leases current in accordance with their terms. The Court retains jurisdiction to adjudicate disputes between the Trustee and CiCi Enterprises and/or the Landlords and to hear adequate assurance related issues. The Trustee may sell assets subject only to a showing of adequate assurance under the standards set out in section 365 of the Bankruptcy Code.

**(b) Impairment and Voting.** Class 2 claims are impaired under the Plan. Each Holder of an Allowed Class 2 Claim is entitled to vote to accept or reject the Plan.

### 5.03. Class 3. Priority Unsecured Claims

**(a) Description and Treatment.** The Debtors' Bankruptcy Schedules included $34,175.13 in accrued vacation time for various of its employees. Debtors included assumption of $6,918.12 of this amount in the sale and proposed sales of certain of their assets. Assuming the proposed sales are approved, approximately $27,257.01 of these claimed amounts remain. Within 20 days of the Effective Date, the Trustee shall object to any claim with which he disagrees. The Court shall retain jurisdiction to adjudicate disputes over these claims. The Trustee shall have discretion to either pay these claims out of the proceeds of ongoing operations or to continue the Debtors practice of incorporating assumption of these liabilities in the purchase price paid for the assets.

**(b) Impairment and Voting.** Class 3 claims are impaired under the Plan. Each Holder of an Allowed Class 3 Claim is entitled to vote to accept or reject the Plan.

---

(landlord for Store 261); Westheimer Blue Willow, Ltd (landlord for Store 347); GPM Houston Properties, LTD (landlord for Store 358); Northwest Tidwell, Ltd (landlord for Store 363); Saul Holdings LTD (landlord for Store 459); JBG/Pike Center, L.L.C. (landlord for Store 465); Levin Management Corporation (landlord for Store 477); Inland US Management, LLC / Bldg.#6137 (landlord for Store 517); Federal Realty Investment Trust (landlord for Store 534); Forty West LLC (landlord for Store 573); WP San Souci Associates, LLC (landlord for Store 643); Regency Realty Group, Inc. (landlord for Store 386); Turfway Investment Group, LLC (landlord for Store 633); MB Land Company (landlord for Store 652); Jubilee-Springdale, LLC (landlord for Store 543); HK New Plan Exchange Property Owner II, LP (landlord for Store 564); VH Deerfield, LLC (landlord for Store 608); WESTPOINTE PLAZA – Castro (landlord for Store 420); Morse & Hamilton, L.P. – Castro (landlord for Store 438); Northridge Crossing LP – Castro (landlord for Store 462); 256 Center, LLC (landlord for Store 478); Dublin Oaks Limited – Castro (landlord for Store 546); Falls Creek Development – Grove City LLC (landlord for Store 636); Lafayette Associates (landlord for Store 351); Century Development Co. (landlord for Store 355); Washington Corner (landlord for Store 360); International Square, LLC (landlord for Store 566); Winbrook Management (landlord for Store 635); Cranberry Creek Partners, Inc. (landlord for Store 452); Huntington Mall Company (landlord for Store 489); Glimcher Properties Limited Partnership (landlord for Store 445); and Wyatt Development Co. (landlord for Store 444).

**5.04. Class 4. Priority Tax Claims**

**(a) Description and Treatment.** The Debtors Bankruptcy Schedules included $665,984.50 (plus one unliquidated claim) in priority tax claims owed to their respective state taxing authorities for unpaid sales and margin taxes. Debtors included assumption of $446,718.00 (and the unliquidated claim) of this amount in the sale and proposed sales of certain of their assets. Assuming the proposed sales are approved, approximately $219,266.50 of these claimed amounts remain. In addition, various taxing authorities have filed priority claims for unpaid, pre-petition, ad valorem taxes.[4] The total amount of these claims is approximately $14,388.25. Upon Confirmation, the Trustee shall immediately move to set the claims deadline for government entities unless the Debtors have already done so. Within 20 days after this deadline, the Trustee shall object to any claim with which he disagrees. The Court shall retain jurisdiction to adjudicate disputes over these priority tax claims. The Trustee shall have discretion to either pay these claims out of the proceeds of ongoing operations or to continue the Debtors practice of incorporating assumption of these liabilities in the purchase price paid for the assets.

**(b) Impairment and Voting.** Class 4 is not a true Class and thus is neither impaired nor unimpaired. The Claimants are not entitled to vote on the Plan.

**5.05. Class 5. Secured Claim of the Frost National Bank**

**(a) Description and Treatment.** Upon Confirmation, the Bank's claim, right to monthly payments of interest, and lien(s) as described in its proof of claims and the Court's cash collateral order [Docket No. 215] (or as renewed and modified by any more recent cash collateral order) survive and remain in full force and effect. The Bank shall receive (subject only to the deductions for cure costs, post-Confirmation administrative costs and general unsecured claims described herein) 100% of the net proceeds of any sale until its claim is paid in full including post-petition interest at the contract rate. Its right to reject a sale for less than the full amount of its claim is limited as follows: If a sale of the Texas and Maryland Assets is proposed that will net $13 million or more (before payment owing to CiCi Enterprises is subtracted) with a closing date within 180 days of the date of Confirmation, Frost loses its absolute right to reject the sale. Frost will be deemed to have consented to a sale of the Texas and Maryland Assets if that sale closes within 180 days of the date of Confirmation and the sale nets $13 million or more (after taking into account all sales costs save and except for the amount owed CiCi Enterprises under the cure cost compromise). If sale proceeds form the Texas and Maryland Assets exceed $13 million after payment of all sales costs and any outstanding administrative claims but before payment to CiCi Enterprises under the cure cost compromise order, 10% of the amount by which these sales proceeds exceed 13 million shall be paid pro-rata to the General Unsecured Claimants in Class 6 in addition to the $30,000.00 carve-out that will initially be distributed to the class. Frost shall be paid the remaining 90% of the amount over $13 million. Frost shall also receive 100% of the net proceeds from the McMullin Lawsuit and any other Retained Cause of Action.

---

[4] These include Clear Creek ISD, Spring Branch ISD, Spring ISD, Humble ISD, Harris County M.U.D., Alief ISD, City of Rosenberg, Fort Bend County, Galveston County, Angelina County, Montgomery County, Harris County, and Cypress Fairbanks ISD.

**(b) Impairment and Voting.** Class 5 claims are impaired under the Plan. Each Holder of an Allowed Class 5 Claim is entitled to vote to accept or reject the Plan.

5.06. **Class 6. General Unsecured Claims**

**(a) Description and Treatment.** Allowed General Unsecured Claims shall be paid a Pro-Rata Share of $30,000.00 of their allowed amount within 30 days from the claims objection deadline. Allowed unsecured claimants shall receive an additional payment only to the extent a sale of the Debtor's assets as described in the Class 5 description generates revenue for that purpose. The additional payment shall be made no later than the 30th day after closing. Excluded from this class are the claims of Awesome Marketing, which were included in the Debtors' Bankruptcy Schedules, as these claims are subject to the cure cost compromise and are thus treated in Class 2. Also excluded are claimants CiCi Enterprises and any Landlord of an Assumed Lease. All of these claimants are Class 2 claimants.

**(b) Impairment and Voting.** Class 6 claims are impaired under the Plan. Each Holder of an Allowed Class 6 Claim is entitled to vote to accept or reject the Plan.

5.07. **Class 7. Equity Interests.**

**(a) Description and Treatment.** No Equity Interest Holders will receive any distribution on account of equity ownership. All Equity Interests will be cancelled upon Confirmation of the Plan.

**(b) Impairment and Voting.** The Holders of Class 7 Equity Interests are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

## ARTICLE VI

## MEANS FOR EXECUTION OF THE PLAN

6.01. **Funding.** The funding of the Plan will be derived from ongoing operations, the proceeds from the sales of Debtors' assets, and any recovery that may be had from the McMullin Lawsuit and the Retained Causes of Action.

6.02. **Claims Not Allowed Pending Objection.** The Trustee shall object to any secured claims or general unsecured claims or commence an adversary proceeding to determine lien validity or priority on or before the 60th day following the Effective Date. Claims not timely objected to or challenged by an adversary proceeding shall be deemed allowed. Claims are not allowed pending resolution of the objection and/or adversary proceeding challenging them.

6.03. **Sales.** Debtors have sold the assets of Pizza Partners of South Carolina, L.P., and have proposed sales of the assets of Pizza Partners of Cincinnati, L.P., Pizza Partners of Ohio, Ltd., Pizza Partners of West Virginia, Limited Partnership, and TEG-Pizza Partners of Indiana, L.P. The Trustee shall continue the ongoing sales efforts with respect to these entities, and shall also work to sell the remainder of Debtors' assets. The proceeds of these sales shall be applied as set forth in the Plan.

**6.04. Plan Trustee.** Milo Segner shall serve as Trustee. Upon the Effective Date, the McMullin Lawsuit and all Retained Causes of Action that are property of the estate will vest in the Trustee for the benefit of the Holders of the Allowed Claims in Classes 1 through 6.[5] The Trustee shall also be empowered and authorized to represent the interests of these Holders of Allowed Claims in the filing of claim objections, whether then pending or later filed, as well as representing those Holders of Allowed claims in any litigation in state court, federal court, or the bankruptcy court in which any party seeks adjudication of a counterclaim against the estate or the determination of validity, priority, or amount of a lien asserted against property of the estate.

The Trustee shall have authority to continue the Debtors' operations and to conduct a sale of the assets when he deems the timing appropriate. Distribution of the proceeds of ongoing operations and from the eventual liquidation shall be in accordance with the Plan.

The Trustee shall be reimbursed for reasonable expenses incurred in carrying out the provisions of the Plan and shall receive compensation as though a Chapter 11 trustee under the provisions of section 326 of the Bankruptcy Code. He shall make application to the Court for approval as if he were a Chapter 11 trustee, with the same procedures for objections and allowance applying. As previously mentioned, the Trustee shall hire Apex Restaurant Group and also retain the services of Mr. Eiserman to carry out the provisions of the Plan. The Trustee may hire such other professionals as are required in his sole discretion.

**6.05. Litigation.** The Debtors' filed a declaratory judgment action against McMullin Investments, L.P. in this Court [Adversary Case 10-03022]. All of Debtors' right, title, and interest in the McMullin Lawsuit and the proceeds therefrom shall vest in the Trustee upon Confirmation of the Plan and shall remain subject to Frost's security interest.

## ARTICLE VII

## CREDITORS' REMEDIES UPON DEFAULT

The treatment provided to Classes of Claims, upon Confirmation of the Plan will constitute a judicial determination of the rights of each claimant. In the event that a creditor does not receive a payment required under the Plan, a creditor can send notice of said default to the Trustee, requesting a response within 20 business days of receipt. If the Trustee fails to respond satisfactorily within 20 days, that creditor may pursue any or all remedies available under state or federal law. Failure to commence an action in a Court of competent jurisdiction by an affected creditor within the applicable statute of limitations after the Trustee's failure to make payment required by the terms of this Plan, without regard to whether there has been given notice of failure to pay and without regard to whether default has occurred, shall cause the claim to be barred by limitations and waiver.

---

[5] As a creditor plan proponent, Frost is not aware of all the potential lawsuits or causes of action that may be property of the estate. The Plan contemplates vesting these as of yet unknown claims in the Trustee for the benefit of the Holders of the Allowed Claims in Classes 1 through 6.

## ARTICLE VIII

## DISPUTED CLAIMS AND OBJECTIONS TO CLAIMS

**8.01.   Objections.**  Any party in interest may file an objection to any Claim within 20 days of the Effective Date, to any secured or general unsecured claim within 60 days of the Effective Date, and to any Priority Tax Claim within 20 days after the bar date for such Claims. All objections not filed within such time shall be deemed waived.

**8.02.   Handling of Disputed Claims.**  Claims which the Debtor has listed in its Disclosure Statement as disputed, or Claims to which any objection is filed prior to the Confirmation Hearing, shall be estimated by the Court for the purpose of establishing the amount which any particular creditor is entitled to vote on the Plan.

**8.03.   Adversary Proceedings.**  After Confirmation, the Trustee may commence any adversary proceeding under Sections 544, 545, 547, 548, 549, 553(b), or 724(a) of the Code. Any adversary proceeding commenced under these sections must be filed with the Court within 6 months of the Effective Date of this Plan or the cause of action is waived.

**8.04.   Payment of Disputed Claims.**  If there is an objection to any Claim filed within the allotted time, the Trustee shall segregate and set aside a portion of the funds on hand for distribution to the claimant's class.  The funds shall be sufficient to satisfy the payment otherwise due on the claim according to the provisions of the Plan.  Funds not so segregated shall be distributed in accordance with the Plan.  In the event the objection is overruled or a dispute is resolved favorably to the party asserting the claim, then the funds shall be paid to the creditor in accordance with applicable class provisions.  In the event the disputed claim is disallowed, the funds segregated in deference to the claim shall be disbursed according to the applicable provisions of the Plan.

## ARTICLE IX

## DISTRIBUTION UNDER THE PLAN

**9.01.   Interim and Final Distributions.**  As soon as practicable after the Effective Date, the Trustee shall make initial Distributions to the Holders of Allowed Claims in accordance with the provisions of Sections 5.01, 5.02, 5.03, 5.04, 5.05, and 5.06 of the Plan. Thereafter, the Trustee shall, from time to time as he deems warranted in his reasonable discretion, make additional Distributions to the Holders of Allowed Claims within said Classes as Contested Claims within such Classes are finally determined and funds are made available for further Distributions.  Prior to making each additional or the final Distribution to the Holders of Allowed Claims within the particular Class, if appropriate, the Trustee shall recalculate each Holder's Pro Rata Share, as necessary, to ensure that each Holder of an Allowed Claim within the particular Class will have received, in the aggregate, a Pro Rata Share of the Distributions consistent with the treatment provisions of Article V of the Plan, as the case may be.

**9.02.   Forms of Distributions.**  Any Cash payment to be made pursuant to the Plan may be made by check or wire transfer, at the option of the Trustee in his sole discretion.

**9.03. Conditions to Distributions, Warranty of Entitlement.** No Holder of an Allowed Claim shall be entitled to a Distribution under the Plan unless and until such Holder provides the Trustee such Holder's tax identification number. Each and every Creditor and Holder of an Interest who receives and accepts a Distribution under the Plan on account of an Allowed Claim is deemed to have warranted to the Trustee that such Claim Holder is the lawful Holder of the Allowed Claim, such Claim Holder is authorized to receive the Distribution, and that there are no outstanding commitments, agreements, or understandings, express or implied that may or can, in any way, defeat or modify the right of the Holder to receive the Distribution.

**9.04. Withholding Taxes.** All Distributions to any Holder of an Allowed Claim shall be made at the address of such Holder set forth on the proof of Claim filed by such Holder (or at the last known addresses of such a Holder if no proof of Claim is filed or if the Trustee has been notified in writing of a change of address). If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Trustee is notified in writing of such Holder's then current address, at which time all missed Distributions shall be made to such Holder without interest. Any Holder of an Allowed Claim whose Distribution is undeliverable must make demand for such Distribution to the Trustee in writing on or before 90 days after the date such undeliverable Distribution was initially made. **The Trustee and its agents and professionals are under no duty to take any action to either attempt to locate any Holder of a Claim, or obtain an executed Internal Revenue Service Form W-9 from any Holder of a Claim.**

**9.05. Unclaimed Property.** Any Distribution that becomes Unclaimed Property shall be retained by the Trustee free and clear of any claims or restrictions thereon, and any entitlement of any Holder of any Claim to such Distributions shall be extinguished and forever barred. Unclaimed Property shall be deposited into a pool for redistribution to other Holders of Allowed Claims in the same Class as the intended recipient of the Unclaimed Property.

**9.06. Duty to Disgorge Overpayments.** To the extent the Holder of any Allowed Claim receives more than what such Holder is permitted to receive under the Plan, such Holder shall immediately return such excess payment(s) to the Trustee, failing which, the Trustee may sue such Holder for the return of the overpayment in the Bankruptcy Court or any other court of competent jurisdiction.

## ARTICLE X

## RETENTION OF JURISDICTION

The Court shall retain jurisdiction of this case after Confirmation and until entry of a final decree under Rule 2015 with respect to the following matters:

a)   To insure that the purpose and intent of this Plan are carried out.

b)   To consider any modification of this Plan under Section 1127 of the Code.

c) To hear and determine all claims, controversies, suits and disputes against the Debtors or the estate.

d) To hear and determine all controversies, suits and disputes that may arise in connection with the interpretation or enforcement of this Plan.

e) To hear and determine all requests for compensation and/or reimbursement of expenses which may be made after the Effective Date of the Plan.

f) To hear and determine all objections to claims, controversies, suits and disputes that may be pending at or initiated after the Effective Date of the Plan, except as provided in the Confirmation Order.

g) To consider and act on the compromise and settlement of any claim against or cause of action on behalf of the Debtor or the estate.

h) To enforce and interpret by injunction or otherwise the terms and conditions of the Plan.

i) To enter an order concluding and terminating this case.

j) To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or Confirmation Order which may be necessary or helpful to carry out the purposes and intent of the Plan.

k) To determine all questions and disputes regarding titles to the assets of the Debtors or the estate.

l) To classify the claims of any creditor and to re-examine claims which have been allowed for purposes of voting, and to determine objections which may be filed to creditors' claims (the failure by the Debtors to object to, or examine any claim for the purposes of voting shall not be deemed a waiver of the Trustee's right to object to, or re-examine the claim in whole or part).

m) To consider and act on such other matters consistent with this Plan as may be provided in the Confirmation Order.

n) To consider the rejection of executory contracts that are not discovered prior to Confirmation and allow claims for damages with respect to the rejection of any such executory contracts within such further time as this Court may direct.

o) To hear and determine all issue related to adequate assurance in conjunction with the assignment of executory contracts.

## ARTICLE XI

## MODIFICATION OF PLAN

Frost may propose amendments or modifications of this plan at any time prior to Confirmation, so long as the modification complies with the requirements of Sections 1122 and 1123 of the Code. After Confirmation, the Trustee may, so long as it does not materially or adversely affect the interest of the creditors, remedy any defect, omission, or reconcile any inconsistencies in the Plan or in the Confirmation Order. This may be done in such manner as may be necessary to carry out the purposes and effect of this Plan.

## ARTICLE XII

## PRIOR ORDERS

Any prior order of this Court shall be deemed temporary, unless otherwise stated, and upon Confirmation of the Plan shall merge with and become subordinated to the terms of the Plan.

Dated: April 5, 2010.

Respectfully submitted,

_/s/ Clay M. Taylor_
J. Stephen Ravel
Texas Bar I.D. 16584975
Clay M. Taylor
Texas Bar I.D. 24033261
C. Josh Osborne
Texas Bar I.D. 24065856
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:    817/332-2500
Telecopy:    817/878-9280

COUNSEL FOR THE FROST NATIONAL BANK

**CERTIFICATE OF SERVICE**

    A true and correct copy of the foregoing document was served on April 5, 2010, on the persons/entities identified as having received service via ECF notification and on the attached service list via first class mail, if the party did not receive via ECF notification.

                                                         */s/ C. Josh Osborne*
                                                         C. Josh Osborne